[No. 6313.]

KIPP, IMPLEADED, ETC., v. MILLER ET AL.

1. **Parties—Defunct Bank**—To an action to ascertain the liabilities of the stockholders of a defunct bank, and for judgment against them, the bank is not a necessary party.—(601, 602)

2. **Dissolved Corporation**—Under sec. 509, Mills' Stats. (Rev. Stats., sec. 899) the dissolution of the corporation does not bar an action against it upon a precedent cause of action.—(602)

3. ——**Directors of Dissolved Corporations**—Where a bank whose charter has expired had assigned its effects before such expiration, for the benefit of its creditors, the directors last serving are not necessary or proper parties to a bill to ascertain the liability of the shareholders, and charge them accordingly. —(603)

4. **Evidence—Corporate Records**—In an action against a defunct bank, the assignee thereof, and the shareholders therein, to ascertain the liabilities of the several shareholders, and charge them accordingly, the books and records kept by the bank in the regular course of business are competent evidence for the creditors, as are also the books of branches established by the bank.—(604)

5. **Corporations — Stockholders' Liability — Plea of Ultra Vires** — Where a bank had organized and controlled certain

branches, providing capital therefor, electing their officers, paying their expenses, and absorbing their profits, all with the knowledge of the shareholders, the shareholders will not, where it is sought to charge them under the statute with liability for the debts of the concern, be heard to plead that the establishment of such branches was ultra vires.—(605-608)

6. Evidence—Presumptions—It will be presumed that the stockholders of a bank had knowledge of a course of business which the corporation pursued for many years, which appeared upon the books and records of the bank, the profits of which they shared, and which was a matter of common knowledge. —(606)

*Appeal from Denver District Court* — Hon. Gʀᴇᴇʟᴇʏ W. Wʜɪᴛꜰᴏʀᴅ, Judge.

Messrs. Mᴜʀʀᴀʏ & Iɴɢᴇʀsᴏʟʟ, for appellants.

Mr. Pʜɪʟᴏ B. Tᴏʟʟᴇs, and Mr. Tʜᴏᴍᴀs D. Cᴜʙʙᴇʏ, for appellee.

This is an action by plaintiffs below, Alfred L. Miller and others, on behalf of themselves and those similarly situated, as creditors of the State Bank of Monte Vista, against the defendants below, appellants here, including the bank itself, Norman H. Chapman, its assignee, and all of the stockholders not theretofore sued in like ground.

The object of the suit was to ascertain the amount of the bank's liabilities at the time of its dissolution, to obtain judgment therefor, and to have an ascertainment of the number of shares held by each defendant stockholder, and the *pro rata* amount of the gross indebtedness, for which each is liable, and for judgment against such as were served or appeared. The section of the statute counted on is 533, Mills' Ann. Stats., and reads as follows:

"Section 1. Shareholders in banks, savings banks, trusts, deposit and security associations, shall be held individually responsible for debts, contracts, and engagements of said associations, in double the

amount of the par value of the stock owned by them respectively."

The stockholders named as defendants are all nonresident. None were personally served and none appeared, except the defendant Kipp, who made voluntary answer, and conducted a defense, which, if successful, on the main contention, exempts all stockholders from liability. Trial was had to the court. The amount of the bank's indebtedness was ascertained to be $84,319.89, of which the defendant stockholders were found liable for $77,147.00, or for fifty-three and one-half per cent. of their statutory liability, which is double the amount of the face value of the stock held by each. Judgment for the full amount was entered against the bank, and the suit as to the assignee was dismissed, he having made disposition of, and fully accounted for, all assets that came into his hands. Complete ascertainment was made as to the shares held by each defendant stockholder, and their respective *pro rata* liability was fixed. The defendant Kipp was found to be the owner of five shares of stock, upon which his *pro rata* liability was $535.00. Judgment and decree was entered accordingly. The defendant Kipp brings the judgment here for review.

Three points are urged, argued and relied upon for reversal:

First. That the bank was an improper party, which fact was pleaded in bar of the action;

Second. The admission of incompetent, immaterial and irrelevant proof, and its insufficiency to warrant the judgment; and,

Third. *Ultra vires,* in that branch banks of the State Bank had been organized, whose assets were included in and covered by the assignment of the State Bank, and the claims of the creditors of which, were allowed as claims against the State Bank, and

included in the ascertainment of the stockholders' liability.

Mr. JUSTICE BAILEY delivered the opinion of the court:

The State Bank was organized on August 11, 1890, to continue for a period of ten years next thereafter. The assignment was made on June 15, 1899, and this suit was begun on June 9, 1905.

The first suggestion is that inasmuch as, by the express terms of its charter, the State Bank ceased to exist on August 11, 1900, therefor it was neither a proper nor possible party to a suit, begun some five years thereafter; that the only persons who could properly be made defendants, as the bank's representatives, are those who were its directors at the time of its dissolution by expiration of its charter, and who are by statute made the trustees of its stockholders and creditors, with full power to manage and settle its corporate affairs. It is argued that the company itself being dead, and the directors, at the time of the dissolution of the company, and the survivors of them, not having been made parties, the judgment is a nullity and should be set aside for this reason alone.

While it may be conceded that, for the purpose of a final adjudication of all matters involved, the bank is a necessary party, such is not the case where a mere ascertainment of the liability of the stockholders, and judgment accordingly, is sought. Nor could the stockholders in such an action plead as a bar thereto the fact that the bank was not a party, because, as was said in *Zang v. Wyant*, 25 Colo. 551:

"Nor does the fact that neither the bank nor the assignee were made parties defendant, in any manner affect the rights of the stockholders, because, whether sued alone or in connection with the bank

and its assignees, they would have the right to interpose any defense to the claim of the creditors which the bank could.''

All of which is true and applicable here. The rights, the liabilities and the defenses of the stockholders are unaffected by the question whether the bank is a party, and a suit, strictly limited to relief against the stockholders, doubtless might be maintained against them alone.

However, that question is not here, since both the bank and its assignee are parties. The question is, can the suit be maintained against the bank, it having been instituted after the expiration of the bank's charter? We answer in the affirmative, since the cause of action arose while the charter was still in force and the bank a going concern. The dissolution of the bank did not deprive creditors of a remedy against it, although sought to be applied after that time. The right of action by the creditor is clear and undisputed, and the remedy is preserved to him by express statute. Sec. 509, Mills' Ann. Stats., reads as follows:

''The dissolution for any cause whatever of corporations created as aforesaid, shall not take away or impair any remedy given against such corporations, its stockholders, or officers, for any liabilities incurred previous to its dissolution.''

In *Steinhauer v. Colmar*, 11 Col. App. 495, the law upon this subject was announced to be thus:

''The dissolution of a corporation cannot be pleaded in bar of an action against it where the cause of action arose before the dissolution.''

In *The Singer & Talcott Co. v. Hutchinson et al.*, the supreme court in 175 Ill., page 49, speaking to a like provision, had this to say:

''While the corporate capacity of this corporation was continued for two years after the expiration

of its charter, or until April 10, 1894, in order to bring suits for the purpose aforesaid, its corporate capacity to be sued as a party defendant, for liabilities which accrued before its dissolution, was continued without limitation as to time, and therefore the general Statute of Limitations, only, would apply. Hence an action at law would lie against said corporation at any time within such general Statute of Limitations for a liability created before its dissolution, if brought before equity had obtained jurisdiction.''

In any event, the contention that the directors of the bank, or the survivors of them, at the time of the expiration of its charter, should have been made parties is not sound, inasmuch as the bank, prior to that time, had transferred all of its property and effects to the assignee, who had taken possession and was engaged in closing up its corporate affairs, under the direction of the court and as its officer. The assignee is a party. Our statute provides in substance that, unless some other person or persons be appointed by some court of competent jurisdiction for the purpose, the board of directors at the time of the dissolution of the corporation shall be trustees of the creditors and stockholders to settle its corporate affairs.

The very thing contemplated by the statute had here taken place, before the bank charter expired. The assignee is an officer of court and may act only upon its orders and under its direction. The court had, in effect, possession of the corporate effects. The old directors of the bank, in these circumstances, had no office or function to perform under the statute. The title of all of the bank's property had passed to the assignee, with the right and power in him to settle its affairs. To have made the old directors defendants would have been an idle and vain thing. It would have served no useful purpose and could

have advantaged no one. In short, it is a matter about which the stockholders may not complain, as they are in no wise prejudiced.

On the questions of the sufficiency of the testimony, and errors in the admission thereof, it may be safely said that there was abundant, competent testimony to amply support the findings of the court and its judgment and decree. The testimony offered, to which objections were interposed, was largely of a record character, made and kept by the bank in the regular course of business, thoroughly identified and sufficiently authenticated. These books and records were clearly competent, as admissions against interest, if on no other ground, whether of original entry or otherwise. On the authority of *Zang v. Wyant, supra,* which relates to rulings on like objections, going to substantially all points here urged, the court below correctly overruled them. These views have the support of the following additional authorities, which might, were there occasion, be largely multiplied: *D. & R. G. v. Wilson,* 4 Col. App. 355; *Plummer v. Struby,* 23 Colo. 190; *McHose v. Wheeler,* 45 Pa. St. 32; *Dows v. Naper,* 91 Ill. 44; *Whitman v. Granite,* 24 Me. 236; *Watson v. Phoenix Bank,* 49 Mass. 217; *Chase v. Smith,* 5 Vt. 567.

The testimony offered and received was sufficient to make a *prima facie* case. The record shows that all the books of the three banks were brought into court, and were there subject to use and inspection by all. If the showing made, to which objection was urged, did not disclose the truth, the defendant had every opportunity and facility to overcome it, but that was not attempted.

For the purpose of this discussion it may be assumed that the action of the Monte Vista State Bank, in organizing and maintaining branches, was *ultra vires.* But even so, are the stockholders of the State

Bank in position to take advantage thereof and so escape personal liability under the statute?

The State Bank was established about August 16, 1890, under the state law, with a capital of $30,000.00. The following January its capital was increased to $80,000.00, and presently thereafter two branches were put in operation with capital furnished by the State Bank, one at Creede, known as the Miners' Bank, and one at Garrison, known originally as the Bank of Garrison; afterward the name Garrison was changed to Hooper, and that of the bank there to the Farmers' Bank. These banks were conducted by the State Bank as branches. They had no separate organization, and were part and parcel of the State Bank. They had no capital, except that furnished by the State Bank, and all property in their possession was the property of the State Bank. The notes taken by them were payable to the State Bank; all moneys deposited there were mingled with the funds of, and used by the State Bank, as its own. From the profits of the State Bank and these branches, the salaries of the officers of the three banks, the running expenses thereof, and dividends, from time to time, to the stockholders of the State Bank, were paid. Such was the usual course of business, and continued from the time of the establishment of the branches to the date of assignment, on June 15, 1899, about eight years. The general publicity was given to the relations between these branch banks and the State Bank. The letter-heads of the branches bore the legend that they were associated with the State Bank, with a capital of $80,000.00, and that J. D. Maben, president of the State Bank, was also president of the associated banks. Each depositor in the branch banks knew its relation to the parent bank, as did every borrower, because all notes taken at the branch banks were made payable to the

State Bank; indeed their relations seem to have been a matter of common knowledge. The records of the directors' meetings disclose these relations. At these meetings, annually, the directors of the State Bank elected the cashier and other officers of the branch banks, except the president, who by virtue of his office as president of the State Bank, according to the testimony, served, and was published to the world, as the president of the branch banks. The stockholders may fairly be assumed to have been present at each yearly stockholders' meeting, either in person or by proxy. Can it be possible that those present at such meetings could fail of knowledge as to the existence of these branches? The records and correspondence show that a very considerable majority of the stockholders had actual knowledge thereof. Under all of these circumstances, including abundant opportunity, covering such a long lapse of time, the presumption must be that all of the stockholders had that knowledge. It is incredible that the fact can be otherwise. In the absence of effort to overcome this presumption by proof, knowledge on the part of the stockholders must be taken as settled.

The testimony further shows that the State Bank was largely sustained by the business of these branches, which is shown, by the official correspondence, to have been more profitable than the independent business of the State Bank. When the State Bank borrowed, it used, indiscriminately, as collateral, notes sent to it from the branches, as well as those taken directly by itself. The stockholders participated in profits from this method of doing business, by way of dividends. The State Bank itself secured a large share of its assets from the branch banks. It is too clear to require discussion that the corporation itself, under these conditions, ought not,

and may not be permitted, to avail itself of the defense of *ultra vires*. No more should the stockholder, who has shared in profits, with either actual or presumptive knowledge, growing out of long acquiescence, and with ample opportunity to obtain it, be permitted to do so, more especially since there is no offer to make return. It is certain that, had the business continued profitable, including that of the branch banks, the stockholder would have continued to accept dividends, without thought of *ultra vires* on the part of the bank. Neither the corporation, nor its stockholders, should be allowed to thus speculate upon the outcome of questionable conduct, accepting profits, so long as there are such, but repudiating, under the plea of *ultra vires,* liability when loss occurs.

The suit is in equity for a judicial ascertainment of the stockholders' liability, and for an adjudication according to the very right. Shall the creditors, who, acting in good faith, have dealt with these branch banks as part of the State Bank, and deposited their moneys upon the credit of the associated banks, with a capital of $80,000.00, be turned away empty handed, on a plea by the stockholders, who have acquiesced in this course of dealing for upwards of eight years, accepting profits accruing therefrom, that the corporation had no authority in law to carry on and conduct its business after that particular manner, or in that particular place? Upon every consideration of fair dealing the answer to this proposition must be in the negative. The bank was a private corporation; no public question is involved. The matter is one calling merely for a just and equitable adjustment of money claims between individuals. The very right can only be done by holding the stockholders to their statutory liability, thus affording the innocent creditor such relief as that course may bring.

By this method justice is done to all and wrong to none.

These views find support in our own decisions, and in the decisions of many other courts of last resort. In *Denver Fire Ins. Co. v. McClelland,* 9 Colo. 12, the court says:

"If a private corporation has accepted and retained the full benefit of a contract, which it had no power to make, the same having been fully performed by the other party thereto, and if the transaction is of such a nature that the party thus performing will suffer manifest hardship and injustice, unless permitted to maintain his action directly upon the contract, no other adequate relief being at his command, the defense of *ultra vires* may be disallowed."—*Denver City I. & W. Co. v. Middaugh,* 12 Colo. 434; *Arthur v. Isreal,* 15 Colo. 152.

In *Darst v. Gayle et al.,* 85 Ill. 136, the court says:

"It is the general rule that the plea of *ultra vires* shall not prevail, where, instead of advancing justice, it will accomplish a wrong. Where a corporation received money upon the faith of its acts and uses the same, and the contract has been fully performed, it, or one succeeding to its rights, cannot plead a want of authority to do the act by which the money was obtained."

In *Boyce v. Mantauk G. C. Co.,* 37 W. Va. 73, a section of the syllabus reads, and the context of the opinion supports it:

"Where a stockholder has notice, or the means of becoming acquainted with contracts made by the corporation in which he is a stockholder, a court of equity will not allow him to remain quiet an unreasonable length of time, with a view of ascertaining whether the contract will result in profit to him, and then repudiate the contract if it has resulted in loss."

In vol. 3 (2d ed.), Thompson on Corporations, paragraph 2846, it is laid down as a general rule: "That stockholders authorizing or acquiescing in *ultra vires* acts cannot afterwards have the same avoided in equity." In support of which he cites, among others, the following cases: *Alexander v. Searcy*, 81 Ga. 536; *Thompson v. Lambert*, 44 Iowa 239; *Peabody v. Flint*, 6 Allen (Mass.) 52; *Dunphy v. Travellers' Newspaper Assn.*, 146 Mass. 495; *Stewart v. Erie Trans. Co.* 17 Minn. 372; *Ashhurst's Appeal*, 60 Pa. St. 290; *Watt's Appeal*, 78 Pa. St. 370; *McCampbell v. Fountain Ry. Co.* 111 Tenn. 55; *Gilman v. Druse*, 111 Wis. 400; *Dimpfell v. Ohio R. R. Co.*, 110 U. S. 209; *Allen v. Wilson*, 28 Fed. 677.

In the English case of *Gregory v. Patchett*, reported in 33 Bevan, at page 595, this was announced:

"Shareholders in a company cannot lie by sanctioning, or by their silence at least acquiescing in, an arrangement which is *ultra vires* of the company, watching the results: and if it be favorable and profitable to themselves to abide by it and insist upon its validity; but if it prove unfavorable and disastrous, then to institute proceedings to set it aside. Therefore where shareholders complained of acts *ultra vires,* which they had acquiesced in for six years, relief was refused."

In Morawetz on Private Corporations (2d ed.), paragraph 630, is as follows:

"Nor can the shareholders of a corporation avoid responsibility for the unauthorized acts of their agents, by abstaining from inquiry into the affairs of the company, or by absenting themselves from the company's meetings, and at the same time reap the benefit of their acts in case of success.

"If a shareholder fails to take the trouble of inquiring into the affairs of the corporation of which he is a member, or to attend its meetings, it seems no

(39)

more than just that his supineness should be construed as an acquiescence in the proceedings of the majority.''

In *Kent v. Quicksilver Mining Company*, 78 N. Y. 187, it was said:

''Where third parties have dealt with the company, relying in good faith upon the existence of corporate authority to do an act, there it is not needed that there be an express assent thereto on the part of the stockholders to work an equitable estoppel upon them. Their conduct may have been such, though negative in character, as to be taken for an acquiescence in the act; and when harm would come to such third parties if the act were held invalid, the stockholders are estopped from questioning it. We suppose acquiescence or tacit assent to mean the neglect to promptly and actively condemn the unauthorized act, and to seek judicial redress, after knowledge of the committal of it, whereby innocent third parties have been led to put themselves in a position from which they cannot be taken without loss.''

On the question of ratification, in paragraph 633 of Morawetz on Private Corporations (2d ed.), this is found:

''The question whether an unauthorized act has been ratified by the members of a corporation is a question of fact to be decided by a jury in a court of law. It is not necessary, for this purpose, that an act of ratification be shown on the part of every individual shareholder; but proof of circumstances from which the court or jury can reasonably infer that the act in question was generally known among the shareholders, and was acquiesced in by them, will constitute at least *prima facie* evidence of ratification. In many cases knowledge may be presumed from cir-

cumstances, and assent may be implied from silence or a failure to act."

In *Thompson v. Lambert,* 44 Iowa 239, the supreme court of that state says, in discussing a question like in principle to the one here under consideration:

"If the stockholders, or any number of them, shall have been cognizant of such a misapplication of the funds borrowed by the corporation, and shall have participated in any advantages resulting therefrom, they will not be permitted to afterward set up such misapplication as a defense in an action by the lender against the corporation for his money.

"It is the duty of stockholders seeking relief from a misapplication of the corporate funds to take immediate steps to prevent it, and if with knowledge of the proposed illegal act they remain silent, they are bound thereby.

"The doctrine of *ultra vires* will be applied to the contracts of corporations only when such contracts remain wholly executory."

The opinion in *Central Trans. Co. v. Pullman,* 139 U. S. 24, cited by appellant, as an authority, in support of his contention, in effect rather upholds the doctrine here announced, under conditions and circumstances such as are disclosed in this case. At page 60 of the reported opinion this language is used:

"A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.

"In such case, however, the action is not maintained upon the unlawful contract, nor according to its term; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

The case of *Ward v. Joslin*, 186 U. S. 142, is not in point. There the bank president, in his official capacity, guaranteed for the corporation the payment of a note, between third parties, not paper of the company, or in which it was interested, purely as an accommodation, which act was without the scope of his authority, and beyond the power of the bank. The bank derived no benefit from the transaction, neither did the stockholder. Upon what principle of equity could he be bound or held by such *ultra vires* act?

No inflexible rule can be laid down, applicable in every case where the question of equitable estoppel is involved. The facts in each case must determine whether the doctrine is there applicable. In the one at bar, under its peculiar facts, it is eminently proper and fit to recognize and enforce it. The judgment and decree of the trial court is affirmed.

*Affirmed.*

Mr. JUSTICE CAMPBELL and Mr. JUSTICE GABBERT concur.