**BRUSSELBACK et al. (Alig et al., Interveners) v. CAGO CORPORATION et al.**

District Court, S. D. New York.
Aug. 11, 1938.

526

Root, Clark, Buckner & Ballantine, of New York City (John M. Harlan, Leslie H. Arps, and Emory T. Nunneley, Jr., all of New York City, of counsel), for plaintiffs.

Henry Woog, of New York City, for plaintiffs-interveners.

Holm, Whitlock & Scarff, of New York City (Joseph Fischer, of New York City, of counsel), for defendant Agnes O'Brien.

Sackett, Chapman, Brown & Cross, of New York City (E. Douglas Hamilton, of New York City, of counsel), for defendant Tribune Fresh Air Fund.

Gibbs, Hand & McCabe, of New York City (Joseph V. McCabe, of New York City, of counsel), for defendant William F. Greegan.

Benjamin Sholemson, of New York City, for defendant Arthur Vare.

Clark, Carr & Ellis, of New York City (Paul A. Crouch, of New York City, of counsel), for defendant Gladys Patterson.

Gifford, Woody, Carter & Hays, of New York City (Charles L. Woody, of New York City, of counsel), for defendants Charles E. Roehl and C. Melville Haight, Jr.

Mack, McCauley, Spiegelberg & Gallagher, of New York City (Paul J. McCauley and George A. Spiegelberg, both of New York City, of counsel), for defendants Cago Corporation, Paul Fox, John H. Gertler, and George A. Spiegelberg.

LeRoy Danziger, of New York City (David Klein, of New York City, of counsel), for defendant Arthur P. Wollheim.

Proskauer, Rose & Paskus, of New York City (Charles Looker, of New York City, of counsel), for defendant Silas M. Moorman.

Louis Scadron, of New York City, for defendant estate of William H. Gleitzman.

Wilson, Wager & Cornell, of New York City (George W. Cornell, of New York City, of counsel), for defendant Mary B. Chamberlaine.

John G. Jackson, of New York City (John G. Jackson, Jr., and Raymond M. Tierney, both of New York City, of counsel), for defendant Battelle, Ludwig & Co.

Wickes & Neilson, of New York City (Joseph F. Regan, of New York City, of counsel), for defendant H. Elbert Foster.

Chadbourne, Wallace, Parke & Whiteside, of New York City, for defendant Ella G. Riggio.

James S. Lawler, of New York City, for defendant Edward W. Banta.

William T. Van Alstyne, of New York City, for defendant Charity Alker.

Coudert Bros., of New York City (Frederick C. Bellinger, of New York City, of counsel), for defendant Joseph P. Bartram.

Jack Fogelson, of New York City, for defendants Sirma and Michael J. Devlet.

WOOLSEY, District Judge.

My decision is:

██ 1. That this suit be dismissed as against defendant Spiegelberg without costs for the reason that he was made a party hereto solely for the purpose of discovery, and has complied with the prayer of the complaint in that respect, leaving no residuum of relief due from him to the plaintiffs.

2. That the suit be dismissed as against Sirma Devlet without costs.

3. That the complainants have, with costs, a decree, as hereinafter indicated in the following memorandum opinion, as against all the other defendants herein who have been served with process and still remain parties because they have not settled with the plaintiffs, or already had the complaint dismissed as against them for other reasons than settlement.

██ I. My subject matter jurisdiction in this cause is based on the fact that the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000, and arises under the laws of the United States. Title 28 United States Code, Section 41 (1) (a), 28 U.S.C.A. § 41 (1) (a).

Subject matter jurisdiction herein on this basis has been sustained, and a remedy in equity for the relief herein sought has been approved by the Circuit Court of Appeals of this Circuit. Brusselback et al. v. Cago Corporation et al., 2 Cir., 85 F.2d 20.

II. The following defendants have been served with process and have appeared and answered: Cago Corporation; Luberta Realty Corporation; Edward W. Banta; Isabel Burgheim; Mary B. Chamberlaine; Michael J. Devlet; Sirma Devlet; John F. Devlin; John H. Gertler; Louis H. Gleitzman and William Gleitzman, as executors of Isaac Gleitzman, now deceased; C. Melville Haight, Jr.; Silas M. Moorman; Agnes O'Brien; Ella G. Riggio; Norman Schloss; William Greegan; Gladys M. Patterson; Miriam B. Kohn; Albert P. Wollheim; Paul Fox; George A. Spiegelberg; Seavey Battelle, Frederick W. Ludwig, Charles Gilbert Miller and Stanley L. Roggenburg, formerly doing business as co-partners under the firm name and style of Battelle, Ludwig & Co.; H. Elbert Foster, Jr., formerly one of the co-partners of Foster-McConnell & Co.; Mary B. Chamberlaine as executrix and Robert L. Chamberlaine as executor of the estate of Rebecca C. Fabens.

III. The following defendants have been served with process and have defaulted, and in respect of them the trial herein constituted an inquest: Florence F. Clifford; R. Earl Merrifield; Mary Z. Shapiro; Anna J. Sullivan; Ray Weinberg; Jacob Zeller; Mary T. Earle; Lucy G. Hesselman; Thomas J. Shanley; Charles S. Irish; Emil H. Sparfeld; Frank R. Swift; Ruth M. Tallman; Robert A. Wallace; Grace B. Whall; John Wilson Cutler and Junius A. Richards, formerly two of the co-partners of Edward B. Smith & Co., and Glee Jamison Smith, as executrix of Albert L. Smith, deceased, formerly one of the partners of Edward B. Smith & Co.

IV. The following defendants have settled with the plaintiffs, and the suit has been dismissed as to them: Charity Alker; Wilbur L. Ball; Condict W. Cutler, Jr.; Charles B. Drake; George E. Hall; David L. Hodgens; Emil Joseph; Edwin H. Kreig; Jessie McHugh; Marie E. Rohn; Michael L. Sinsheimer; S. B. Searing; Helen O. W. Nesmith; Alvano T. Nickerson; Charles E. Roehl; Stuyvesant Fish, Samuel T. Callaway, Trowbridge Callaway, Robert H. Cox, Walter Merrill Hall, Herman N. Rosenwald, William A. Tall, Willard S. Simpkins, and Frank L. Scheffey, formerly co-partners doing business under the firm name and style of Callaway, Fish & Co.; Jansen Noyes, Leo M. Blancke, Clifford Hemphill, Walter T. Collins, Stanton Griffis, Charles L. Morse, Jr., Harold C. Strong and Kenneth K. Ward, co-partners doing business under the firm name and style of Hemphill, Noyes & Co.; Russell Merrick doing business under the firm name and style of Merrick & Co.; Joseph P. Bartram, as trustee for Daisy D. Bartram.

V. The following defendants were served but as to them the suit was dismissed for various reasons other than settlement: Arthur A. Marshall; Arthur Vare; Walter Hewett; Henry Gee; Meyer Salzman; Tribune Fresh Air Fund.

VI. The following defendants named herein have not been served with process and, therefore, they are not parties to this cause: Jeanne Gertler; Combined Industries, Inc.; J. D. Andrews; Charles Armbrecht; M. T. Arnold; Charles S. Bartow, Jr.; Anita D. Brown; Andrew Casazza; Louis T. Chiavelli; James T. Dean; Ida B. Evans; Anne Dalzell Harris; Joseph Kahn; Pauline Lettermen; Cecelia Livingston; W. McClure Locher; Thomas McKnight; Katherine Schuman; Robert Scoville; William L. Trumble; Frieda Bernstein; Anna Frost; R. R. Koeser; Carrie Meyer; Mildred Zaretzby; Freeman G. Allen; Judith Eve Cowen; Margaret J. Sylvester Cowles; Elizabeth F. Ellis; Amy E. Haviland; Arthur Oakly; Charles J. Russ; Doris Goldstandt; Frieda Brand; Radcliffe Cheston, Jr.; Charles S. Cheston; Reginald G. Coombe; Edward C. Sayers; Rodney W. Brown; Harold G. Hathaway; Robert F. Whitmer, Jr.; Harcourt Amory, Reginald E. Heard, Walter C. Boothroyd and Edward B. Smith, Jr., together with Albert L. Smith, now deceased, formerly some of the co-partners doing business under the firm name and style of Edward B. Smith & Co.; Girard Trust Co., Geoffrey S. Smith and Charles S. Cheston, as executors of Albert L. Smith; Lorenzo Semple; Robert E. McConnell, Walter S. Marvin, Harvey S. Mudd and Seeley G. Mudd, formerly some of the copartners doing business under the firm name and style of Foster, McConnell & Co.

VII. Inasmuch as under the decision of the United States Supreme Court on April

25, 1938, in Interstate Circuit, Inc., v. United States, 304 U.S. 55, 57, 58 S.Ct. 768, 769, 82 L.Ed. 1146, it is indicated that formal findings of fact and conclusions of law separately stated under Equity Rule 70½, Title 28 United States Code Annotated following Section 723, must supersede any opinion in an equity case, I shall content myself with indicating generally my findings of fact and reasons therefor and my conclusions of law herein, without attempting to write a considered opinion such as the interesting questions of law herein raised by the defendants tempt me to do.

VIII. *The Question of Insolvency and Quantum of Assessment*

■ I hold that the original receivership set up by the Federal Farm Loan Board on October 1st, 1932, is a matter with which this Court cannot properly deal. That was an act of an executive administrative board, and I think, whilst there may be some question as to whether the bank was insolvent at the time—on October 1st, when the receiver was originally appointed—there is not any question whatever that it would have been insolvent on November 1st, 1932, and therefore the directors were merely forestalling by one month, at most, the situation which they had to meet. And I think that there is nothing which I can possibly do about the original receivership, so we have to take that as it stands.

■ Now, how does it stand? I was thoroughly satisfied by the evidence of the five farm experts called herein,—Arnold, Cochrane, Kahlert, Brown and Wahler—for I thought they knew their job most extraordinarily well. They all had seen all the farms as to which they were testifying, and they seemed to know, even by name, every tract; they had it all absolutely letter perfect and they were marvelous, it seemed to me, as experts, so it is abundantly safe for me to say that they knew what they were testifying about, and to adopt what they testified to as correct, namely; that the present deficit of the Chicago Joint Stock Land Bank is in excess of $13,500,-000.

We know that the deficit by the receiver's books on December 31, 1937, was $12,-831,214.22, and we also know that the only substantial asset items as to which there could be room for argument are the real estate owned and the sheriff's certificates, or master's certificates, as I think they are

called in one of the states, and as to those two items, the real estate owned and the sheriff's certificates, these experts testified, as I have stated, most clearly and I adopt the values they fixed without going into the detail of all the multitudinous exhibits which are part of this branch of the case.

I think that we can look at the matter thus:

1. The real estate owned by the receiver was carried at the unpaid balance of the original mortgage loan except that, in cases where title had been acquired by the bank one year prior to the receivership, the property was carried at the amount of the unpaid balance of the loan or the re-appraised value of the property, whichever was less.

2. The real estate represented by sheriff's certificates or master's certificates was carried at the unpaid balance of the original unpaid loan.

The testimony of the expert witnesses on that shows:

1. That the present reasonable market value of the real estate owned by the receiver is upwards of $585,000 less than its carrying value on the receiver's books as shown on December 31, 1937.

2. That the total market value of the real estate represented by the sheriff's certificates or master's certificates is less by upwards of $89,759 than their carrying value on the receiver's books.

So if we take this and do a sum with it, we have:

Total real estate owned at carrying value is $3,242,558.20.

Total real estate owned at the expert valuation is $2,657,125.64 as here found.

By way of parenthesis, I should, perhaps, say here that this includes the carrying value of 50 farms at $446,173.17 in Southeastern Iowa, which had been serviced up to his death by Field Agent Tuttle who died in January, 1938, and so was not available as a witness. But the witness Wahler testified that the same class of farms located in the same territory which he himself serviced in Iowa, would clearly not be worth a greater amount than their carrying value. So we get a maximum value on that.

This, therefore, shows that the carrying value of real estate owned exceeds the experts' valuation, which I have adopted, by $585,432.56.

The total of the sheriff's and master's certificates at carrying value was $582,599.80 and, at experts' valuation, was $493,039.96. Thus the carrying value thereof exceeds the experts' valuation by $89,559.84.

The total deficit of the bank, therefore, as shown by the evidence in this case, is greater than that carrying value on December 31, 1937, by $674,992.40.

Assuming my figuring is correct, if you add to the deficit by the receiver's books—based on the carrying value—of $12,831,214.22, the sum just mentioned of $674,992.40, you have a total deficit of $13,506,206.62 as of the present time. That is the deficit which I find.

The total outstanding stock of the bank at the date of the receivership was 40,000 shares. And that had a total par value of $4,000,000.

Since the deficit of the bank exceeds $13,500,000, the maximum liability of the stockholders evidently is for the total of the par value of their stock. In other words a 100 per cent assessment is necessary.

IX. *The Status of the Cago Corporation*

██ The only really seriously disputed question of fact is whether defendants John H. Gertler and Michael J. Devlet are jointly and severally liable for an assessment on the 10,533 shares of stock registered in the name of Cago Corporation or held in its portfolio.

The master facts involved in this controversy—either admitted or proved beyond peradventure—are as follows:

1. Paul Fox was the accountant for Gertler, Devlet & Co. at a salary of $3,000 a year, and in 1931 and 1932, the crucial periods herein, did not possess any assets of consequence other than this salary.

2. Gertler, Devlet & Co. had specialized in joint stock land bank securities for many years, and in January, 1931, in a proxy fight carried on in an attempt to secure the election of one Guy Huston as President of the Chicago Joint Stock Land Bank, had, as a firm, accumulated a large block of the stock thereof.

3. Cago Corporation was formed on June 30, 1931, confessedly to create a shield for the real owners of Chicago Bank Stock, against double liability under Title 12, United States Code, Section 812, 12 U.S.C.A. § 812.

4. Paul Fox admits that the three stockholders—his brother and two stenographers in his office—were dummies, and claims that he was the beneficial owner of all the stock of the Cago Corporation and formed it to speculate in the stock of the Chicago Joint Stock Land Bank and the stock of other joint stock land banks.

5. The Cago Corporation did not keep books of account contemporaneously in the regular course of business, but Fox wrote up the books in 1935 or 1936 to give the transactions of the Cago Corporation a semblance of historical reality.

6. The Cago Corporation did not hold regular meetings either of its stockholders or directors. In fact it was merely a protective coloring for Paul Fox.

7. The Chicago Land Bank Stock purchased by Cago Corporation was all purchased from or through Gertler, Devlet & Co.

8. The money paid for all such stock was turned over in cash to John H. Gertler or Michael J. Devlet, and, so far as this record shows, came to rest in their hands.

9. Cago Corporation was Gertler, Devlet & Co.'s only customer to whom the firm gave credit.

10. The firm of Gertler, Devlet & Co. advanced some money to Cago Corporation through Fox on May 26, 1931, as Fox reluctantly admitted.

11. Material books and papers of Gertler, Devlet & Co. covering the crucial periods herein have disappeared.

12. On March 10, 1931, about three months before the Cago Corporation was formed, the firm of Gertler, Devlet & Co. distributed its holdings of Chicago Land Bank stock to its several partners in proportion to their respective interests therein.

13. Then, almost immediately, Fox tried to get all the stock of the partners into Cago Corporation by purchase at nominal sums, and succeeded, except in the case of one partner, Carter, who refused to join what he regarded as a Gertler, Devlet & Co. venture.

14. The firm of Gertler, Devlet & Co. in August, 1933, put forward a reorganization plan of the Chicago Joint Stock

Land Bank, under which, inter alia, stockholders were to exchange their stock for stock of a state corporation with the usual limited liability, and thus escape the double liability involved in stock ownership of the bank under Title 12, United States Code Section 812, 12 U.S.C.A. § 812.

15. At that time, August, 1933, the Cago Corporation was registered owner of, or had endorsed in blank in its portfolio, more than 25% of the shares of stock of the Chicago Joint Stock Land Bank.

It has always seemed to me that so-called circumstantial evidence tends to be far stronger than any direct evidence short of an admission. For the trier of the facts can never tell except by his own impressions why a witness testifies thus or thus. Circumstances, on the other hand, have not any prejudices or grudges, or any interests or vanities to serve. Consequently, they make, I think, much the best bases on which to reconstruct the past.

When, therefore, all the sign posts of the circumstances, developed from different angles of approach to a situation, point to the same spot, truth usually will be found to dwell there.

In the present case many, if not most, of the circumstances, enumerated above as master facts, were wrung from the mouths of unwilling witnesses, who disclaimed the apparent significance of such facts. I refer especially to Paul Fox, John H. Gertler and Frederick F. Carr, but I did not believe these three witnesses except insofar as their evidence was confirmed by writings of various kinds. Indeed, I think that Fox repeatedly testified falsely. For example: his contention that he received from his father most of the money to purchase the capital stock of Cago Corporation and the money to buy shares of the Chicago Joint Stock Land Bank was shown to be entirely incredible, for reasons unnecessary here to detail, and I so find.

Paul Fox was what I call a very "technical" witness, and, I find, never told the whole truth, as he swore to do when he took the stand. This is notably shown by his evidence about the $200 cheque of Gertler, Devlet & Co. Because that firm had given it to him and he had deposited it in his bank account and then had paid it, at once, over to Cago Corporation, he testified,—until broken down by the records—that it was his own money he was giving to Cago.

I suspect—although there is no basis for a finding to this effect—that Gertler, Devlet & Co. gave to Bernard Fox, deceased father of Paul Fox, the money Paul Fox used in setting up the Cago Corporation and in purchasing shares of the Chicago Joint Stock Land Bank therefor, that Paul Fox knew this, but still was willing to testify that the money came from his dead father—as technically it may be said to have done. Indeed the use of cash instead of cheques in all the Cago Corporation's dealings shows them to have had clandestine objectives.

The evidence of Carr, a clerk in the employ of Gertler, Devlet & Co. with a salary of $100 a week, that, circa August 11, 1932, he had received a "bonus" of $4,500, but could not remember for what he had paid out $3,000 on August 16, 1932, and $1,000 on September 17, 1932, was astounding. The reason for such loss of memory appears, however, when it is found that $3,000 in cash was deposited in the Cago Corporation's account on August 17, 1932, and $1,000 in cash on September 19, 1932.

These instances I have mentioned were only the most flagrant among many instances of disregard of their oath by the witnesses on the Cago Corporation situation.

The whole situation, however, is in my opinion clinched as against the defendants Cago Corporation, Gertler and Devlet by Devlet's failure to be present at the trial of this cause, wherein upwards of a million dollars was being claimed against him, and by his consistent and successful avoidance of the service on him by the plaintiff's attorneys—in spite of every effort on their part—of any subpoena to secure him as a witness herein. Such an attitude under all the circumstances of this cause has an effect on the trier of the facts similar to the effect which would be produced by a defendant's flight in a criminal case—i. e., that absence was, in the fugitive's opinion, the part of wisdom. Cf. Mammoth Oil Co. v. United States, 275 U.S. 13, 51-53, 48 S.Ct. 1, 9, 10, 72 L.Ed. 137.

Therefore, I find, on the facts, that the Cago Corporation was a mere shell— the creature of John H. Gertler and Michael J. Devlet—and did not constitute an insulating device for them as beneficial

owners of the stock of the Chicago Joint Stock Land Bank registered in the name of Cago Corporation or for the stock found in its portfolio endorsed in blank—a total of 10,533 shares. I find that Cago Corporation was a joint venture of John H. Gertler and Michael J. Devlet by which they hoped, awaiting eventualities, to maintain, without risk, their position in its stock although they knew of the bank's precarious condition, and consequently that John H. Gertler and Michael J. Devlet were and are the beneficial owners of said stock and are jointly and severally liable for the assessment on stockholders herein found necessary.

The decree as to this stock will provide primary recovery against John H. Gertler and Michael J. Devlet, jointly and severally, as the actual joint and several beneficial owners thereof, and secondary recovery against Cago Corporation as registered owner thereof.

In this finding as to the Cago Corporation I have not attempted to do much more than summarize my views, and when formal findings of fact are submitted by counsel for the plaintiff, they may propose findings dealing in such detail as they may be advised with the evidence of Fox, Gertler, Carr and any other witness, who may have touched on the position of the Cago Corporation herein.

X. I find that the defendants John H. Gertler and Michael J. Devlet are the beneficial owners of, and, therefore, are jointly and severally liable for the assessment on the said bank stock still registered in the names of J. A. Andrews, Andrew Casazza, Louis T. Chiavelli and Thomas McKnight, aggregating 780 shares.

XI. *Conclusions of Law*

A. I rule against the defendants on the question of segregation of the security underlying the bonds.

It seems to me that there is no provision in the law, that has been called to my attention, explicit enough to earmark the bonds deposited with the Farm Loan Registrar as deposited for particular bonds that were issued after the deposit of such securities. Cf. Title 12 United States Code Sections 855, 856, 895, 897, 12 U.S.C.A. §§ 855, 856, 895, 897.

It is agreed, that as a matter of administrative interpretation of the Act by the Farm Loan Board, there never was such a segregation. It seems to me, therefore, that the decision in McLucas v. Langworthy, D.C., 7 F.Supp. 457, which so holds, is right.

Therefore, I hold that the successive groups of mortgages that were deposited with the Registrar must be regarded as fungibles which were all behind all the bonds which the Chicago Joint Stock Land Bank had issued, and therefore they must all be considered as security for all those bonds.

B. On the question of fixing the par value of the stock of the bank at $100, which the defendants claim should be fixed at $5, under the statute, I do not agree with the defendants.

I agree with Judge Patterson's decision in Todd v. Russell, D.C., 1 F.Supp. 788, 789, 790. I might add that as he is one of my colleagues in this court, proper judicial comity would require me to follow his ruling, even if I did not agree with it.

In addition I should like to remark that I cannot see how it makes a whit of difference to a defendant stockholder in a case of this kind whether the amount of the par value is fixed at $100 or at $5. It does not affect the quantum of his liability as a stockholder, for if he owned, we will say, X dollars worth of stock, the amount of his liability is the same whether the said X dollars worth of stock be divided by 100 or by 5.

C. The defendants have raised the point that such of the plaintiffs in this cause, as were also plaintiffs in the case of Brusselback et al. v. Chicago Joint Stock Land Bank et al., 7 Cir., 85 F.2d 617, have lost their locus standi herein, because their motion in the Illinois case that John B. Gallagher should be appointed as receiver with power to prosecute their actions outside Illinois was granted and an order entered thereon which stands unreversed.

I do not agree.

In the first place, I think the receiver appointed by the Illinois court would, no matter what the terms of the order, not have had any power to bring suit outside of the territorial jurisdiction of the court which appointed him.

Then, on the precise point of an assignment which counsel for the defendant argues,—created by reason of the prayer of

the plaintiff plus the order of the court—I hold that the only way in which the assignment could have been made complete by court action in Illinois would have been if the court in Illinois had ordered the plaintiffs to execute assignments to Mr. Gallagher and they had done so; in that event Mr. Gallagher would have become an actual assignee, and not a quasi-assignee as the defendant's counsel calls him. Therefore, I overrule this defence.

### D. *The Defence of Laches*

The receivership occurred October 1, 1932, and this suit was brought August 8, 1935, so it was brought within two years and ten months after the cause of action could be considered to have accrued, if it be supposed to have accrued at the time of the receivership.

The date this suit was commenced is within the three year limitation in New York State, which of course in Federal equity is taken only as a general standard.

But it is certainly true that an equity court will never sustain a defense of laches when the suit is brought within the period of a state court statute of limitations, unless a very much clearer showing is made of reasons why the defence should be sustained than I have heard herein during the trial at any time.

It seems to me that the fact that some of the defendants saw fit to destroy their records before the three years had elapsed is a wholly inconceivable ground for considering that the plaintiffs were guilty of laches.

I hold therefore that there is not any ground whatever for attributing to the plaintiffs any affirmative negligence in not earlier commencing this cause, and that, accordingly, the plaintiffs were not guilty of laches herein.

### E. *The Question of Ultra Vires*

1. In the desire to tap for the benefit of farmers all the sources of funds, public and private, two kinds of banks were made possible by the Federal Farm Loan Act of July 17, 1916, Title 12 United States Code, Section 641 et seq., 12 U.S.C.A. § 641 et seq., namely, Federal Land Banks and Joint Stock Land Banks.

Federal Land Banks were supposed to become cooperative banks by a kind of *statutory* evolution due to the requirement that borrowers from such banks should buy stock in them.

Joint Stock Land Banks, however, were created as private institutions for the purpose of making profit.

The Federal Farm Land Banks were limited to making their loans through Farm Loan Associations, the formation of which is described in the statute, or through certain prescribed and designated agents. The Joint Stock Land Banks, however, loaned direct to the farmers. Cf. O'Connell v. St. Louis Joint Stock Land Bank, 170 Ark. 778, 281 S.W. 385, 388, and also The Federal Farm Loan Bureau,—Its History, Activities and Organization,—by W. Stull Holt, being Publication No. 54 of the Institute of Government Research, published 1924, through the Johns Hopkins Press.

2. Section 811 of Title 12 United States Code, 12 U.S.C.A. § 811, provides for the creation of joint stock land banks "for carrying on the business of lending on farm mortgage security and issuing farm loan bonds."

Section 791 of the same statute, Title 12 United States Code, 12 U.S.C.A. § 791, provides that "no Federal land bank shall have power * * * to loan on first mortgage except through national farm loan associations * * * or through agents."

Section 823 of Title 12 of the United States Code, 12 U.S.C.A. § 823, provides—italics mine—that "any Federal land bank * * * may, with the approval of the Farm Credit Administration, acquire the assets and assume the liabilities of any joint stock land bank, and *in such transaction any Federal land bank may waive the provisions of this chapter requiring such bank to acquire its loans only through national farm loan associations or agents,* and those relating to status of borrower, purpose of loan, and also the limitation as to the amount of individual loans."

It seems to me that this is an express recognition that joint stock land banks are not limited, as Federal Land Banks are, to making loans only through Farm Loan Associations or through certain named types of agents.

That portion of Section 823 was not affected by the subsequent amendment of March 4, 1925.

Furthermore, national farm loan associations have not any power to take loans from joint stock land banks. If, therefore, joint stock land banks were in the position

of only being able to make loans through national farm loan associations we should have the curious situation of having the business of joint stock land banks limited to borrowers who were not authorized to borrow from them, which would be an obvious absurdity. Cf. also Sections 720, 721, 761, with regard to the constitution of national farm loan associations.

It is abundantly clear to my mind, therefore, that joint stock land banks had not any connection whatever with the national farm loan associations.

The administrative interpretation of the Act has recognized this. Cf. Annual Report of Federal Farm Loan Board, December 31, 1932; and House Document 346, 2nd Session of 72nd Congress at pages 20, 22, 23, wherein the distinction between the two forms of lending agencies are succinctly stated, and see Treasury Department's Statement of Conditions of Federal Land Banks and Joint Stock Land Banks as of June 30, 1932, at page 10.

With all due deference, it seems to me quite clear that the dictum of Mr. Justice Holmes in Wheeler v. Greene, 280 U.S. 49, 50 S.Ct. 21, 74 L.Ed. 160, wherein, comparing joint stock land banks with national banks, and not with Federal land banks, he said at page 51, 50 S.Ct. at page 21, that they were (italics mine) "created to make loans of farm mortgages *to members of an association in a territorially limited district,* and are relatively local affairs", does not find any support in the Federal Farm Loan Act. This dictum has been one of the main reliances of counsel for defendants in their defence of ultra vires, but, it seems to me, cannot avail them in the absence of any statutory ground on which to base it.

It is clear, in my opinion, that as joint stock land banks are not limited to loans made through national farm loan associations, or a named type of agent, the only question that remains now is whether the present suit is an attempt to saddle on stockholders a liability for an act *outside* of the purpose of the joint stock land bank, which, as above stated, was *"for carrying on the business of lending on farm mortgage security and issuing farm loan bonds,"* or whether the method followed throughout the whole life of this bank merely involved carelessness or irregularity of some kind in the way in which farm mortgage loans were made.

3. Section 812 of Title 12 United States Code, 12 U.S.C.A. § 812, deals with the liability of shareholders and makes each shareholder individually responsible "for all contracts, debts, and engagements" of a joint stock land bank up to the par value of the amount of stock which each stockholder owned in addition to the amount which he might have paid in for it.

Section 771, subsection 11, Title 12 United States Code, 12 U.S.C.A. § 771, subsec. 11, is made applicable to joint stock land banks by Section 818 of the same Act, 12 U.S.C.A. § 818, and that Section 771, subdivision 11, under the caption *"Loans not invalidated by unauthorized acts by banks or associations"* reads as follows: "No loan or the mortgage securing the same shall be impaired or invalidated by reason of the exercise of any power by any Federal land bank or national farm loan association in excess of the powers herein granted or any limitations thereon."

It is further provided in Section 871 of Title 12 United States Code, 12 U.S.C.A. § 871, under the caption, *"Land banks as bound by acts of officers and Credit Administration . issue of bonds",* as follows: "Each land bank shall be bound in all respects by the acts of its officers in signing and issuing farm loan bonds and by the acts of the Farm Credit Administration in authorizing their issue."

It seems to me that, by reason of these three sections, as the business of loaning on farm mortgages as followed by the bank in this case was the business for which it was specially created, if there were any irregularity in the method by which the loans were made on the mortgages, it did not impair or invalidate the mortgage or the bonds that were issued by the bank.

Furthermore, as all the issues of the farm loan bonds of the bank were duly approved by the farm credit administration they were cured of any irregularity and the bank issuing them was bound by them.

Consequently it seems to me the case of Ward v. Joslin, 186 U.S. 142, 22 S.Ct. 807, 46 L.Ed. 1093, is not controlling, because it involved an excursion by a bank into a realm wholly outside of the powers conferred on it, and not merely an irregularity of procedure within the powers conferred on it.

Also in connection with the doctrine of Ward v. Joslin, it must be remembered that there was not any such provision in the Kansas constitution or statutes there in-

volved, validating irregularities, as we have here in Section 771, subsection 11, and in section 871.

■ 4. As a matter of fact, this is a case in which stockholders have received the benefit of the moneys which the bondholders now seek to recover, and after having acquiesced for a long time in the procedure by which the bank made its loans, the stockholders are not able to assert, as a defence to their liability on their stock, the claim that they were not liable for any obligations to the bondholders. In this connection the following cases are of interest: Lamb v. Abendroth et al., 268 Mich. 73, 255 N.W. 447, 448; Kipp v. Miller, 47 Colo. 598, 108 P. 164, 167, 135 Am.St.Rep. 236, and Kent v. Quicksilver Mining Co., 78 N. Y. 159, 187.

■ 5. It must be remembered in approaching the matter, as a practical question, that when the bondholders bought farm loan bonds issued by the bank they relied (a) on the credit of the bank itself, (b) on the security afforded by all the mortgages which lay behind the bonds, and (c) on the statutory liability of the stockholders for the amount equivalent to the par value of the stock.

Certainly the directors of the bank, chosen by the stockholders, could not by interstitial irregularities in their methods of making loans on mortgages, or by bad management owing to which the bank became insolvent, deprive the creditors of the bank of their statutory right against stockholders which was a part of the security on which they bought their bonds. Cf. Van Tuyl v. Robin, 80 Misc. 360, 368, 142 N.Y. S. 535, affirmed in 160 App.Div. 41, 145 N. Y.S. 121, and in 211 N.Y. 540, 105 N.E. 1101.

■ The defence of ultra vires, the burden of establishing which falls on the defendants, must for the reasons above stated fail.

■ F. This suit has been dismissed as against the defendant Arthur Vare, as he was an infant when the stock was put in his name, and disaffirmed his liability thereon as soon as he learned about it after attaining his majority. As to all other registered owners of stock on the books of the bank at the time of the receivership, I hold that they are liable, even though they may not have been also beneficial owners of the stock. Cf. Kenyon v. Fowler, 2 Cir.

1907, 155 F. 107 affirmed, 215 U.S. 593, 30 S.Ct. 409, 54 L.Ed. 341.

■ But if they are not beneficial owners and the beneficial owners are also parties hereto, then the primary liability shall be that of the beneficial owners, and the registered owners shall be secondarily liable only to the extent that the beneficial owner does not or cannot satisfy the decree.

G. The decree as against Paul Fox cannot be the same as against Mr. Spiegelberg for I am not satisfied that he has made such full and true discovery as was within his power. The plaintiff's attorneys may propose in respect of him such decree as they consider meets the situation herein found.

XII. *As to Costs and Disbursements*

As the amount recoverable against each defendant is fixed by the 100% assessment multiplied by the number of shares owned by him, I shall not attempt to state the amount due from each defendant, but shall leave that to the plaintiff's attorneys to include in the final decree which they may have, with costs, as against each defendant.

■ As to the disbursements for the trial minutes I find that about one third of the minutes involved the insolvency issue and the expense of that third—i. e., taxable travel expenses, lodging, board and incidentals—should be taxed equally against all the defendants.

The expense of the two thirds of the minutes which were involved in the Cago Corporation issue must be borne primarily by defendants Gertler and Devlet jointly and severally and secondarily by the Cago Corporation.

XIII. *As to Formal Findings of Fact and Conclusions of Law*

Before the final decree is presented for settlement the plaintiffs must prepare findings of fact and conclusions of law consistent with the foregoing memorandum opinion but further developed as they are advised, and serve them on the attorneys for the defendants, whom they seek to include in the final decree with ten days notice of settlement.

The defendants' attorneys may then serve suggestions as to changes in the findings so proposed.

In order to facilitate any changes which I may deem appropriate, I suggest that the

findings and the conclusions submitted by the plaintiffs' attorneys be typed with triple spacing.

Only the findings approved by me will be filed as part of the record herein.

XIV. After costs are taxed and the findings of fact and conclusions of law are signed by me, a final decree may be noticed for settlement and submitted to me through the Clerk's office.