### In re PARIS.

District Court, S. D. New York.

Aug. 10, 1933.

George Z. Medalie, U. S. Atty., of New York City (Thomas E. Dewey and Barent Ten Eyck, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Benjamin F. Lerch, of New York City, for respondent.

CAFFEY, District Judge.

The present inquiry is whether the respondent, David Paris, committed a contempt of this court in presenting to it affidavits which were forged, in support of an application by him, as attorney in behalf of his brother Sidney Paris, for a new trial.

The question is important. It is important to the respondent; it involves him as a member of the bar of this court. It is important to the government officials who are accused, in the affidavits alleged to be forged, of misconduct; even worse, of subornation of perjury in connection with the five persons in whose names the alleged forged affidavits were made and who testified as witnesses for the government at the Bennett trial. It is important to the court. The court sits to do justice; it cannot succeed in the performance of that office unless it can trust documents presented to it by members of the bar. The court is helpless to administer justice if it must stop to investigate in every instance, when a member of its bar presents for its consideration a document, as to whether or not it is genuine. The court has a right to rely with confidence on the good faith of documents brought to it by lawyers. It is therefore of extreme importance to the court to determine whether or not affidavits submitted for its action upon a motion for a new trial are forged and fictitious.

In the challenged affidavits, on their face, it is sought to disclaim the testimony of five persons who were witnesses for the government at the trial of the Bennett case. In those affidavits it is charged by each of the alleged signers: First, that what they then testified was perjury; secondly, that they were procured so to perjure themselves by coercion or by offers of reward by those connected with the government, both in the United States attorney's office and in the postal service, that they were induced either by threats or by promises to testify falsely, to commit perjury, the government officials therefore being charged with having suborned perjury; third, that now the alleged makers of those affidavits recant their testimony given at the trial and explain that they gave it under the circumstances I have related about being suborned by the government officials to give it.

What could be graver for the consideration of a court than to determine whether such affidavits, which are handed up for its official action upon a motion for a new trial, are genuine, when in response there are presented on the same day, in opposition, affidavits, concededly signed by the same individuals whose names purport to be affixed to the affidavits in support of the motion, which say that their names were forged to and that there is not a word of truth in the affidavits presented in support of the motion?

When that situation arose, it became the duty of the court, instantly, immediately, and to the sacrifice of the conduct of other business of the court, to institute this inquiry. It has been pursued since the 10th of July. Adequate opportunity has been afforded to both sides to put in whatever testimony they saw fit. Much consideration has been given to this testimony.

I repeat, hardly anything can be of more importance in the administration of justice by the court than to reach a correct solution of the problem thus presented.

There are five affidavits which it is claimed were forged.

First are those by Samuel Walters and David Walters. The testimony as to the genuineness of the signatures to those two affidavits is in dispute. It is not essential to the disposition of the present inquiry that I determine that dispute. Those affidavits I shall dispose of when I come to the motion for a new trial. I shall, therefore, for the present purposes lay them aside for the moment.

The other three affidavits are by Mrs. Mayer, Lapkin, and Waterman. Were they forged? The proof is manifest and incontrovertible that each of them was forged. It is beyond the realm of rational controversy that three of the affidavits presented to this

court by the respondent in support of the motion for a new trial were forged. In argument yesterday it was conceded that they were forged. Counsel for the respondent frankly said so. This admission was not necessary, however, because the proof had already established that they were forged, though, it should be noted, it is not claimed that the respondent personally signed the affidavits. Nevertheless, the admission removes the issue as to whether they are forged.

Under the proof also no issue arises as to who forged the affidavits, except as between Samuel Walters and Sidney Paris. Plainly one or the other forged the three affidavits. I am satisfied by the proof that all of them were forged by Sidney Paris. The testimony is convincing that that is what happened.

The witness Bertha Friedman told the truth. There is no need to resort to experts about the Lapkin affidavit. Bertha Friedman's testimony satisfied me that Sidney Paris signed the name of Lapkin to the affidavit presented.

█ Neither in law nor in common sense is a judge or a jury, any trier of facts, bound to abide by the opinions of people as to the facts. Expert testimony is taken for the assistance of triers of the facts. The proof here convinces me, without resort to any expert opinion, that the handwriting in which the names of Mrs. Mayer and Waterman are signed to the affidavits presented in the names of those two, is that of Sidney Paris. Even the signature of one of the notaries is forged. The elderly gentleman, Mr. Paul, who appeared on the stand perfectly satisfied me that where the name of Mr. Peterson is included, bunglingly made and altered, even misspelled, in one of the affidavits, it is not the signature of Mr. Peterson.

There was therefore forgery of the three affidavits, and the name of the notary public was forged in one of them.

What is the responsibility of the respondent? That is the serious feature of the inquiry.

█ No action should be taken by this court affecting a member of its bar without the exercise of great caution. Moreover, in a case of this character guilt should not be declared unless it be established by a high measure of proof.

There is a good deal of conflict in the testimony bearing on this phase of the matter; whether the respondent had knowledge or what would be the equivalent of knowledge; whether he exercised due care or whether he closed his eyes; whether he presented the forged affidavits to the court without any effort to ascertain whether they were genuine. He testified as to the two Walters affidavits that he was present when they were signed. I have laid them aside to be dealt with when I come to the motion for a new trial. I am now dealing with the three affidavits of Mrs. Mayer, Lapkin, and Waterman. They are concededly forged.

What is the duty of a lawyer who comes into court and lays affidavits before it as a basis for its action? As I have indicated, no conclusion adverse to the respondent should be drawn unless it be based on proof beyond reasonable doubt. I shall not give weight for the moment to the testimony given by other witnesses to the contrary of what was said by the respondent himself. I shall take up for consideration now only what he himself said. What is it?

First, he personally drew all the affidavits.

Second, he never made inquiry of any of the persons whose names purport to be signed to the affidavits. These were affidavits in which the persons whose names were attached confessed perjury on their own part at the trial of the Bennett case, accused the government officials of subornation of perjury, and wholly recanted their own testimony given at the trial. Yet, according to the respondent's own testimony, he never asked any one of the three a single question as to whether or not what he, without inquiry, had put into the affidavits was true or untrue.

Third, the respondent says that he relied on the statements to him of Samuel Walters to the effect that the three persons concerned would sign the affidavits. As I have said, I do not at present go into the dispute of that. I take the statement on the subject as made by the respondent himself. The respondent knew that Samuel Walters was a crook; the respondent knew that Samuel Walters was a forger. It is argued by the respondent, through his counsel, that in no respect was Samuel Walters to be relied upon. Yet the respondent says in his own behalf that he relied exclusively on Samuel Walters when he (Walters) said that he would procure affidavits from three persons confessing perjury, charging government officials with subornation of perjury, and recanting their testimony, without ever propounding a question or attempting to propound a question to those persons. In addition, concurrently, while the scheme was in progress, the scheme for getting affidavits and making use of them

for a new trial motion or otherwise, which resulted in the three being actually used on the motion for a new trial, the respondent says that he became the attorney for Samuel Walters, without fee, and put Walters under obligation to himself. Further, during the same period the respondent acted as attorney in the foreclosure contempt proceedings for Samuel Walters and his parents. Yet, without inquiry of the three witnesses, the respondent relied wholly upon Samuel Walters' statement that these people would sign the affidavits he had drawn.

Fourth, there were produced, late in the present trial, after Mrs. Mayer had testified, other affidavits bearing her name which had been in the possession of the respondent for a number of weeks preceding July 5, the day the papers on the motion for a new trial were served. The respondent had in his hands, at the time the affidavit in the name of Mrs. Mayer was presented in this case, two other affidavits purporting to have been made by her. Mere inspection and comparison of the handwriting of the signatures on those affidavits would have demonstrated clearly that the three papers were not signed by the same person. One of those affidavits even had the given name "Edith," in the body of the affidavit as well as in the signature, plainly written over a scratched or altered surface, thus disclosing that the word "Edith" had been substituted for another name.

Lastly, did the respondent have any reason to suspect that any of the affidavits would be repudiated? Again, I resort only to his own statement. He testified, and he has proved to my satisfaction, that on July 10, in advance of the submission of the new trial motion at a later hour that day, the day on which he offered all the affidavits, Samuel Walters was in his office and then notified him that at least two of the involved persons would repudiate the affidavits he had served. Did he stop or halt or hestiate? Not at all. He walked into court with that information given to him, within half an hour after he had received it, and presented the identical affidavits to the court and insisted on their genuineness.

What are the excuses?

First, the respondent says that Samuel Walters proposed to get the affidavits and either deliver them or cause them to be delivered. This is the man in whom, according to his own testimony, no credence whatsoever is to be placed; a crook and a forger, and known by him to be a crook and a forger.

Yet the respondent says he should be deemed blameless because that kind of a man brought the affidavits to him. He says he had no actual knowledge that the documents were forged. Is that enough? Is that sufficient to constitute lack of knowledge? He says he made no inquiry either of Samuel Walters or of anybody else. He concedes that he made no effort whatever to find whether the affidavits were genuine. Even when Walters warned him that two of the affidavits would be repudiated, he made no effort. He went further. He continued the effort to show the authenticity of the affidavits throughout the trial until during the closing argument by his counsel yesterday.

In connection with the law of the case, I shall come back to the question of knowledge and of what constitutes knowledge, not only in this branch of the law, but under any aspect of the law; the law as to when a man is on inquiry, when he is put on inquiry.

Second, the respondent offers Zektzer to corroborate him.

Zektzer in no material respect helps the respondent. Zektzer says that he never opened the two sealed envelopes left in his possession and said by Samuel Walters to contain, one of them the affidavit of Mrs. Mayer, and the other the affidavit of Waterman. If he had inquired of Zektzer, the respondent would have been told that Zektzer had no knowledge whatsoever with respect to what was contained in the envelopes. Whatever Zektzer knew about the affidavits was acquired solely from Samuel Walters, to whom the proof shows the respondent had frequent personal access.

Again, the respondent testifies to certain telephone conversations during the session of the Legislature in Albany, to the effect that Zektzer had received affidavits of Waterman and Mrs. Mayer.

The Legislature adjourned April 10. The only one of the affidavits with which we are now concerned which bears date of execution earlier than April 10 is that of Waterman. It purports to have been verified on April 5. Waterman testifies that he was in the state of Virginia at that time, and I believe him. The affidavit presented in the name of Mrs. Mayer is dated June 3, nearly two months after the Legislature had adjourned.

Not even can there be corroboration out of the testimony of Zektzer with respect to two other affidavits claimed to have been signed by Mrs. Mayer, which respondent had in his possession. Exhibit 40 purports to

have been signed on May 13, and Exhibit V on May 17. The respondent brought forward a fourth affidavit purporting to bear the signature of Mrs. Mayer. This is dated March 31. It is the affidavit that he said he redrafted. He says he used this in drawing the one he turned over to Walters. There is no claim that the fourth affidavit, said to have been verified March 31, was ever in the hands of Zektzer.

On analysis of the testimony, Zektzer furnishes no corroboration. On the contrary, there is most serious conflict. When the respondent took the stand first, his testimony was unequivocal that Zektzer was the attorney for Mrs. Mayer; that Zektzer told him that she had consulted him (Zektzer) as to the signing of the affidavit, and he advised her to sign it. Mrs. Mayer testified and Zektzer testified that he was not and never was her attorney subsequent to January, 1931, while the affidavits are dated in 1933. Zektzer testified that she never conferred with him about any affidavit; that she never consulted him at all and he never advised her, and he did not even see a document with her name signed to it. All that he saw was a sealed envelope. Whether or not there was inclosed an affidavit by Mrs. Mayer rested wholly upon an inference he drew from something Samuel Walters had said to him.

Later in his testimony the respondent stated that he was in error and withdrew his statement with respect to Zektzer having consulted with and advised Mrs. Mayer. Nevertheless, this does not help the respondent. There is no support of him. On the other hand, there is direct conflict between the testimony of Zektzer and that given by the respondent.

Furthermore, if Zektzer had the conversation from Albany while the respondent was in Albany during the session of the Legislature, referring to having in possession affidavits of Waterman and Mrs. Mayer, a question propounded to him by the respondent would have revealed that Zektzer had no information, and, as he testified on the stand, to this day he has had no actual information whatever, about either affidavit.

I repeat that the fact that the latest affidavit, the one presented in support of the motion in the name of Mrs. Mayer, is dated June 3, demonstrates that it could not have been in the possession of Zektzer at the time of the Albany conversation preceding April 10. The March 31 affidavit, Exhibit O, purporting to have been executed in the presence

of the notary Rosenthal, who was not produced, is the only one of the four produced in the name of Mrs. Mayer dated earlier than April 10. While I would not accept without corroboration anything that Samuel Walters says about it, the circumstances in this case indicate pretty plainly that Mrs. Mayer never signed that affidavit with anything in it at the time of her signature relating to this case or relating to Sidney Paris. Her signature is on page 6. The circumstance as to page 6 of that affidavit, devoted to merely extraneous matter about Samuel Walters, having nothing whatever to do with Sidney Paris or with anything connected with the Bennett case, convinces me that the explanation given by Samuel Walters as to how that March 31 affidavit was procured from Mrs. Mayer is probably the truth and that, when it was signed, the affidavit contained none of the pages, preceding page 6, which relate to the Bennett case.

I have already pointed out that Exhibit V, the alleged affidavit brought forward at a late stage by the respondent, the alleged affidavit of Mrs. Mayer purporting to have been executed on May 17, before the notary Peterson, is a plain forgery. Mrs. Mayer never signed it. Look at it. The forgery is obvious. The name "Edith" was substituted. You can see the forgery in the name "Edith" at the end by mere inspection.

What follows from all this?

■ As I have indicated, in the law what any man in the exercise of ordinary care might learn, what he purposely shuts his eyes to exclude, is just as much within his knowledge as is actual direct knowledge.

■ Consider what the respondent was engaged on. He was going to court to present affidavits calling for action by the court. The action he was seeking was setting aside the solemn verdict of a jury. In those affidavits the alleged makers said that they had committed perjury at the trial in which the verdict was rendered. In those affidavits the alleged makers said that their commission of that perjury had been brought about by government officials. In those affidavits the alleged makers said that they recanted what they had testified at the trial; that now they wanted to relieve their souls of the injury they had done.

Was there any duty on the part of the lawyer to inquire or to make some investigation, and not to rely exclusively upon things a crook and forger told him, before he

brought such affidavits for such a purpose to the court, which had a right to rely upon his having taken due care to ascertain that those documents were genuine before they were presented? The question answers itself. In practically every branch of the law, where knowledge or notice is involved, the rule is the same; you know what you ought to have known, when you were under the duty to make inquiry and to ascertain for yourself what is the truth.

The subject, however, has been expressly dealt with by the courts. The case of United States v. Ford (D. C.) 9 F.(2d) 990, 991, is particularly in point. It was there held, in respect to a matter like this, that negligence on the part of an attorney is equivalent to actual knowledge.

In that case an attorney submitted to the court a bill of exceptions which contained a number of exceptions that had not been taken at the trial. He presented also an assignment of error which had no basis whatsoever in the record. When cited for contempt his excuses were, as to the exceptions not taken at the trial and which were embodied in the proposed bill of exceptions, that he had left to the court reporter the preparation of the bill of exceptions, had failed himself to examine it, and had no knowledge that there were contained any exceptions which had not been taken at the trial. As to the assignment of error which had no basis, his explanation was that he turned a form over to his own stenographer and left to the stenographer the preparation of the assignments of error. He had not looked at these and had not observed the unfounded assignment of error, which was important.

The court was in some doubt as to whether he told the whole truth, or had actual knowledge in respect to some phases of the matter. It therefore made no finding against him upon the issues of fact in dispute. Nevertheless, in convicting him of contempt of court, it said:

" * * * Lack of actual knowledge does not constitute a defense, but only an extenuating circumstance in mitigation. It is counsel's duty to know the contents of documents he presents for action by the court, and presentation is a representation that this duty has been performed. It is presumed he knows. It is also counsel's duty to knowingly present none but documents true in their statement of facts, and therein again presentation is a representation of this duty performed—that counsel believes the facts to be true, and that in so far as they purport to relate counsel's acts they are true.

"In its action therein, the court perforce relies upon counsel, and justice depends upon performance of these duties by counsel. If counsel presents improper or untrue documents, in respect to which he has failed in any of the duties aforesaid, it is his voluntary and intentional act, and in any aspect is so far culpable and contemptuous that his other labors, haste, carelessness, neglect, or consequent ignorance is no defense, but may go in mitigation.

"So, too, of lack of evil intent. In contempt, as in many varieties of crime, not always needs there be an evil quality of the mind. It suffices if the latter's equivalent appears in forgetfulness, neglect, or failure of or indifference to duty or consequences. * * *

"Little need be said to emphasize that the administration of justice depends upon the integrity of judicial proceedings and records. Falsification of either obstructs and defeats justice. In consequence, if falsification be done or attempted intentionally in fact or equivalent as aforesaid, it is contempt of the authority of the court, and usually also a crime. Done by an attorney of the court, it is more reprehensible than by others; for it is an abuse of his office, a betrayal of his trust, a violation of his oath, infidelity to the court to which, and not to his client, is counsel's first duty always, and a profanation of the temple of justice."

As long ago as 1850, Chief Justice Taney, in Lord v. Veazie, 8 How. 251, 255, 12 L. Ed. 1067, declared deception of a court to be punishable contempt. The latest pronouncement by the Supreme Court of the United States I have found on the subject of contempt committed in judicial proceedings is Clark v. United States, 289 U. S. 1, 53 S. Ct. 465, 468, 77 L. Ed. 993, which was decided on March 13 of this year. There deception was practiced on the court by a juror, in withholding information or giving false answers on the examination on the voir dire as to qualifications to serve on a jury. Mr. Justice Cardozo wrote the opinion. He discussed fully and completely all the governing questions. He cited with approval the Ford Case (D. C.) 9 F.(2d) 990, from which I have quoted at length. He said, among other things: "Deceit by an attorney may be punished as a contempt if the deceit is an abuse of the functions of his office."

He also cited Bowles v. United States, 50 F.(2d) 848, 850, decided by the Circuit Court

of Appeals for the Fourth Circuit, in which there are assembled and discussed the authorities relating to contempt by an attorney through failure to perform his duties, or otherwise misleading or attempting to mislead the court, including a number of decisions in this circuit.

It is the judgment of the court, therefore, and I find that the respondent, David Paris, is guilty of contempt of this court in presenting on a motion for a new trial, in which he appeared as attorney for his brother, the three forged affidavits of Mrs. Mayer, Lapkin, and Waterman, without having made inquiry as to their genuineness, other than in the most superficial respect and from a source which he himself repudiates as wholly unreliable, and, through neglect and failure to exercise that care which was owing by him to this court as a member of its bar, in seeking to interfere with the due administration of justice in this court.

There are circumstances in mitigation.

Nobody actually told the respondent that the three affidavits were not signed by the alleged makers. He was told, however, that two of the alleged makers would say they had not signed them.

The respondent is the brother of the defendant in whose behalf the motion was made. I am satisfied that he was largely animated by affection for his brother. That is a mitigating circumstance of great consequence. I have gained the impression also, while sitting here for the past five weeks and listening to all the testimony, that the respondent in a sort of way got an obsession on the subject of his brother. That perhaps is creditable to his heart. I think I should take that into account.

I shall therefore temper the sentence. I shall make it less severe; I shall make it even of a different kind than I would have made it but for the mitigating circumstances.

The sentence of the court is that the respondent be, and he hereby is, suspended from practicing at the bar of this court for a period of five years; with leave at the end of five years, but not earlier, to make a showing of his conduct in the meanwhile upon application for permission to appear again at the bar of this court.

I feel that I would not perform my judicial duty unless I added that I commend the action of the assistant United States attorneys who have presented the testimony in this case to me. This was done with the utmost fairness. It has been done with industry, and it has been done with persistence.