## In re GLADSTONE et al.

District Court, S. D. New York.
Aug. 24, 1939.

John T. Cahill, U. S. Atty., of New York City (Joseph P. Martin, Asst. U. S. Atty., of New York City, of counsel), in support of the information.

Walter H. Pollak, with whom were associated as counsel Charles E. McMahon, and Mordecai Rochlin, all of New York City, for defendant Milton Gladstone.

Kaufman & Weitzner, of New York City, Samuel H. Kaufman and Eugene M. Parter, both of New York City, of counsel, for defendant David J. Lewis.

WOOLSEY, District Judge.

My judgment in this proceeding is for the Government; and the relief which I grant, for the reasons hereinafter stated, against the respondents Gladstone and Lewis is:

1. I hold that the respondent Milton Gladstone is in contempt of this Court, and, as his punishment therefor, because this record shows that he is not a fit person to be an attorney of this Court, I hold that his petition for admission to the Bar of this Court should be dismissed, and that he should be permanently debarred from admission thereto, and,

2. I hold that respondent David J. Lewis should be disbarred and his name stricken from the roll of attorneys of this Court.

I. My subject matter jurisdiction is based on the inherent right of a court, in order to maintain the integrity of judicial proceedings, to discipline appropriately those who are concerned with it in the administration of justice before it, in case they are guilty of improper practices.

II. It is common ground (1) that David J. Lewis was admitted to the Bar of this Court on April 18, 1930, and (2) that Milton Gladstone is not a member of the Bar of this Court.

Although Gladstone claims to have been admitted to the Bar of this Court at some unnamed date between 1916 and 1917 on a motion made at the motion calendar, he never signed the roll of attorneys of this Court, and so, under Rule 1 of the then current rules thereof [1] never achieved the status of a member of the Bar of this Court, and so cannot be subject to discipline by disbarment. He now petitions by way of counterclaim to the information, to have his omission to sign the roll corrected nunc pro tunc so that his membership in the Bar of this Court may be completed.

III. As this is a disciplinary proceeding against Gladstone, who was not, but acted as, a member of the Bar of this Court, and Lewis, who was a member thereof, it was quite obvious, when this fact was discovered,—before the amendment of the information—that the remedies against the two defendants must differ in the event that the information was sustained against them.

Consequently, I find that it was appropriate to have the prayer of the information read as it does in the alternative on the question of the disciplinary measures to be meted out to the respondents, asking that the Court "decree against the said Milton Gladstone and David J. Lewis such disciplinary measures as to this Court may seem just and proper; and in the event that the evidence adduced upon the hearing indicated that either Milton Gladstone or David J. Lewis be not a member of the

---

[1] This rule reads as follows (italics mine):

"1. Attorneys—The Bar of this Court shall consist of those persons heretofore and hereafter admitted to practice, *and* who have signed or shall sign the roll of attorneys; provided, however, that all attorneys and solicitors of the Circuit Court of the United States for the Southern District of New York entitled to practice as such on December 31, 1911, shall be qualified attorneys of this Court without motion or other formal admission.

"Motions for admission to the Bar shall be made and the oath of office taken in open Court, on days when the General Motion Calendar is heard. (So amended May 1, 1913, taking effect May 17, 1915.)"

Bar of the United States District Court for the Southern District of New York, that he be adjudged in contempt of court."

■ A disciplinary proceeding such as is here involved is not in pari materia with a proceeding for criminal contempt, and neither the statute of limitations on criminal contempts nor the burden of proof therein required are here applicable.

■ All that is required in a disciplinary proceeding of this kind is convincing proof that the respondents were guilty of the acts charged in the information.

IV. Motions have been made by the attorneys for both respondents to strike out parts of the evidence and certain of the exhibits.

It may be that there would be a technical objection in a jury case to some of the evidence and to some of the exhibits admitted at the trial herein, but both the testimony allowed and the exhibits marked in evidence contribute definitely, although with varying degrees of probative force, to paint the picture involved herein.

Therefore, after going carefully over the testimony and exhibits involved in the two motions, I have decided that I will not herein canalize the evidence and exhibits more than I have done.

■ The finding of a conspiracy, hereinafter noted, has rendered admissible much evidence which would not have been admissible as against both respondents in the absence of such a finding. Furthermore, a disciplinary proceeding is not and should not be tried as a criminal case, and where, as here, a multi-partite situation is involved in such a proceeding, the court should be untrammelled in its investigation of every facet thereof.

The motions to strike are all denied.

V. In view of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, it is now a work of supererogation to write a considered opinion on the facts or law in any non-jury case or proceeding, for its place will be taken by formal findings of fact and conclusions of law separately stated.

I will content myself, therefore, in this proceeding with a reference to such facts as I think explain my decision and a statement of my conclusions of law thereon.

VI. Out of the garnered wisdom of a wide forensic experience Mr. Emory R. Buckner, lately the United States Attorney for this District, and one of the great trial lawyers of our time, once wisely remarked: "There is not any such thing as a democracy of facts."

The truth of this statement has been recurrently brought home to me, when I have had to decide closely contested questions of fact involving the reconstruction of past events.

For there will always be found in every cause certain master facts either stipulated, otherwise admitted, or proved without challenge, which constitute the control by which controversial facts must be tested.

Herein these master facts are as follows:

1. The Hotel Governor Clinton, Inc., hereinafter sometimes referred to as the corporation, or the hotel debtor, was organized in 1929. Herman Gabbe and Maurice Cantor were the organizers and chief stockholders of the corporation. Together they owned about 90% of its stock. They became its principal officers and directors.

2. The corporation erected a hotel at Seventh Avenue and 31st Street in New York City that was opened for business in 1929.

3. The corporation's property was subject to a trust mortgage of $6,500,000 securing bonds of that amount, of which $5,000,000 of Series A bonds was a first lien, and $1,500,000 of Series B bonds was a second lien.

4. The corporation was in exclusive control and operation of the hotel from August, 1929 until December 1, 1931. On December 1, 1931, because the hotel's earnings were not sufficient to pay taxes and interest, an arrangement was made between the corporation and a committee representing Series A bondholders, whereby the management of the hotel was taken over by the bondholders committee. The committee placed its own representative in charge of the hotel, and the net receipts were deposited for the benefit of the Series A bondholders.

5. Milton Gladstone became the attorney for Herman Gabbe, above mentioned, in 1932, and soon thereafter became attorney for the hotel corporation.

6. June 14, 1935, a petition for reorganization under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, was filed by the corporation as debtor in the United States District Court, Southern District

of New York. On the same day an order was signed by which the Court continued the debtor in possession of the property, but left the arrangement made between the corporation and the bondholders committee undisturbed. On July 31, 1935, a contract with the Knott Management Corporation was approved by the Court for the management of the hotel debtor. The corporation, as debtor, remained in possession subject to that contract.

7. The firm of Gladstone, Richter, Cohen & Kirsh were counsel for the corporation as debtor in the reorganization proceedings. Milton Gladstone of that firm was in charge of the matter. In April, 1936, the firm was dissolved. There was no formal substitution of attorneys, and Milton Gladstone continued to act as counsel for the debtor corporation.

Sullivan & Cromwell, who had been acting as attorneys for the Series A bondholders committee during the period while the committee managed the hotel, continued to represent the committee in the reorganization proceedings. Just after the petition for reorganization was filed, Kadel, Van Kirk & Trencher joined Sullivan & Cromwell as attorneys for the committee. Both firms continued to represent the committee throughout the reorganization proceedings. Delano Andrews of Sullivan & Cromwell and John Kadel and Nicholas Jones of Kadel, Van Kirk & Trencher were in charge of the reorganization proceedings for their respective firms.

8. Gladstone, Richter, Cohen & Kirsh and Milton Gladstone, as counsel for the debtor, among other services, took care of all administrative matters in the reorganization proceedings, instituted proceedings for and obtained reduction of real estate assessments, and objected to claims and conducted hearings thereon before a special master.

9. Several plans of reorganization were proposed and numerous hearings were held before a Special Master during the years 1935 and 1936. An amended plan of reorganization, formulated by the Series A committee, was finally adopted. The plan was dated December 1, 1936, and filed with the Court December 8, 1936.

Among other things the plan provided that the property of the debtor corporation would be transferred to a new corporation. Gabbe and Cantor were given an option to purchase stock in that corporation. The plan also provided for a management contract to a corporation to be formed by Gabbe and Cantor.

10. By a lease dated April 5, 1929, Terminal Barber Shops, Inc., hereinafter called Terminal, let from the Hotel Governor Clinton, Inc., for a term of twenty years beginning July 1, 1929, premises within the hotel, to be used as a barber shop and beauty parlor. The rental fixed in the lease was 15% of the gross receipts with a minimum guaranty of $15,000 per year.

11. The lease was modified by an agreement dated February 9, 1932, reducing the minimum rental to $10,000 a year for the period ending August 18, 1933.

12. The lease was further modified by an agreement dated April 18, 1933, abrogating the minimum rental guaranteed in the lease for the period ending December 31, 1935.

13. The actual rentals paid by Terminal Barber Shops, Inc., under said lease and modifications are:

| | |
|---|---|
| From opening in 1929 to December 31, 1929 | $ 3,323.71 |
| For year 1930 | $17,200.48 |
| For year 1931 | $12,500. |
| For year 1932 | $10,658.54 |
| For year 1933 | $ 4,744.97 |
| For year 1934 | $ 5,598.73 |
| For year 1935 | $ 4,977.39 |

14. The rent was paid in full in accordance with these modifications of the lease through the year 1935.

15. During the year 1936, the original provisions of the lease were in effect, providing for a rental of 15% of gross receipts with a minimum of $15,000 for the year.

16. The actual rental paid in 1936 was $5,137.21. There was, therefore, back rent due on December 31, 1936, in the sum of $9,862.79.

17. Between December 18 and December 29, 1936, negotiations,—initiated after a meeting between one Stein, a vice president of Terminal, and Gladstone,—were had between William Saxe, then attorney for Terminal, and Gladstone, attorney for the hotel debtor, looking to a cancellation of the lease. As the exact results of these negotiations is somewhat controversial, it is perhaps fairer to leave it for a finding of fact by me, and merely to state here what is common ground, namely, that the payment of a considerable sum of money to the hotel debtor was discussed, but that

862

an agreement of settlement was not consummated before December 29, 1936.

18. Lewis had represented Mrs. Gabbe in Gabbe's bankruptcy, and towards the end of that proceeding had become the second trustee in bankruptcy for Gabbe in order to give Gabbe's Estate a representation on a foreclosure.

19. Lewis' name was seeded into Saxe's mind by Gladstone on December 18, 1936, and was again mentioned on December 29, 1936.

20. Gladstone and Lewis had then known each other for about fifteen years.

21. Saxe had never heard of Lewis before December 18, 1936.

22. On December 29, 1936, after Lewis had been mentioned to Saxe for the second time by Gladstone as a lawyer who knew persons involved in the reorganization of the hotel debtor, and before Saxe had met Lewis, he retained him by telephone to represent Terminal in the lease negotiations.

23. On December 29, after this telephone talk between Lewis and Saxe, Lewis consulted Gladstone on the subject of his accepting this retainer. Gladstone approved and Lewis accepted.

24. On December 29, after this telephone conference between Lewis and Gladstone, Lewis went to see Saxe, and then met him for the first time.

25. Andrews never heard of Lewis until February 2, 1937, and had never met him until long after the crucial period here involved.

26. Kadel never met Lewis until January, 1937, and Kadel's partner, Jones, had not heard of him or met him until the latter part of February, 1937.

27. Gladstone knew that Lewis was not acquainted with anyone in the reorganization proceeding except himself, and, —if they should be considered as included therein,—the Gabbe interests.

28. The form of retainer of Lewis by Saxe for Terminal was agreed January 6, 1937, but not then reduced into final written form.

29. The so-called negotiations between Gladstone and Lewis as to the settlement of the lease controversy began on January 7, 1937.

30. The written retainer from Terminal to Lewis, which is an unusual document, reached him January 14, 1937. It took the form of a letter from Terminal under date of January 14, 1937, agreed to by Lewis, and read as follows:

"January 14, 1937

"Mr. David J. Lewis
"130 West 46th Street,
"New York, N. Y.
"Dear Mr. Lewis:

"We have shown you the documents between the landlord and ourselves, as tenant, covering the premises located at Hotel Governor Clinton, New York City. You have expressed to our attorney certain tentative opinions respecting possible landlord's waivers of rights or defenses to its possible claims under these documents.

"We would like to entrust to you negotiations for the cancellation of our tenancy (involving the termination of any obligation on our part under such documents, except to the extent herein specifically set forth). You will be authorized to commit us in such connection, only, however, in consideration for a cancellation of such tenancy and a termination of any such obligation, all as of a date prior to March 1, 1937, for the following maximum considerations (which considerations shall include any rent payable from January 1, 1937, to the date of the vacation of the premises pursuant to such cancellation and termination):

"1. Payment of the sum of $27,362.79.

"2. Payment of a sum equal to 10% of gross receipts received by us from our business in said premises and within the rooms of the hotel (as well as any and all receipts received from sub-tenants or licensees) for the period January 1, 1937, to the date of vacating the premises pursuant to such cancellation and termination;

"3. The transfer of the furniture and fixtures now upon the premises (in such condition as the same may be at the date of vacating the premises pursuant to any such cancellation or termination).

"It is understood that such maximum considerations are to include any compensation which you may be entitled to and any disbursements incurred by you either on your or our behalf in connection herewith (such compensation and disbursements to aggregate the difference between the maximum considerations hereinbefore referred to and the actual amount for which you are able, under the terms and conditions hereof, to obtain the said cancellation and termination). All documents of cancella-

tion and termination shall be in form and substance satisfactory to us. If you are unable to effect such cancellation and termination upon the terms and conditions hereof prior to March 1, 1937, we are to have no obligation hereunder to you or to others of any kind.

"Very truly yours,
"Terminal Barber Shops, Inc.
"By Howard S. Gans
"Vice President."

31. The amount of $27,362.79 fixed in this retainer as the limit of the contingent fee which Lewis could earn represents the sum of $9,862.79—the back rent due on the lease for the year 1936—plus the sum of $17,500.

32. The basis for settlement of the Terminal lease controversy was arrived at tentatively between Gladstone and Lewis on January 16, 1937,—two days after the written retainer was received,—and finally settled January 18, 1937. Under it the hotel debtor was not to get any cash, but was to get the furniture and fixtures and equipment of Terminal, then in the hotel, in return for the cancellation of the lease.

33. The closing date at which the papers consummating the settlement were to be exchanged was fixed between Gladstone and Lewis as January 20, 1937.

34. The papers first submitted for closing of the settlement did not contain any provision for a court order approving the settlement, but Delano Andrews, representing the committee for Series A bondholders, insisted, so soon as the papers were submitted to him on January 20, that the settlement should be approved by the court and in this he was supported by his co-counsel for the committee, Kadel and Jones.

35. The petition for the order permitting settlement was verified January 22, 1937.

V. The gravamen of the charge involving both the respondents is that during the month of December, 1936, they entered into a conspiracy to defraud the estate of the debtor corporation, Hotel Governor Clinton, Inc., of a substantial sum of money.

Incidentally to the conspiracy Gladstone is charged with failure on two occasions adequately to disclose to the Court the history of the settlement negotiations.

The charges against both respondents are thus brought to a focus in paragraphs 16–21 of the information. These read as follows:

"16. David J. Lewis was employed through William Saxe by the Terminal Barber Shops, Inc. at the instance of Milton Gladstone on or about December 28, 1936.

"17. The retainer of David J. Lewis by the Terminal Barber Shops, Inc., provided a fee for his services in obtaining a cancellation of the lease of the difference between the amount of the settlement and the sum of $27,000 and the fixtures.

"18. David J. Lewis and Milton Gladstone agreed upon a settlement terminating the lease by a transfer of the equipment so that the entire $27,000 cash would be kept by Lewis.

"19. A permissive order was obtained from the Court approving the settlement. At the time of the application the Court was not informed of the previous negotiations wherein the estate was to receive cash. The Court was informed that there was a serious question whether the debtor had not broken the lease when in fact there was actually no serious question.

"20. Milton Gladstone promised the attorney for the lessee to make a full disclosure to the attorneys for the bondholders' committee to obtain their approval. He did not make such a full disclosure but urged them to give their approval immediately.

"21. During the month of December, 1936, a conspiracy was formed between Milton Gladstone and David J. Lewis to defraud the estate of the debtor corporation, Hotel Governor Clinton, Inc., of the sum of $27,000."

VI. A. The relationships inter sese of the dramatis personae in the somewhat unusual situation herein under consideration should be borne carefully in mind.

1. Between Terminal Barber Shops, Inc., and its several successive attorneys, Saxe, Lewis and Spiegelberg, and between Gladstone and his client, the debtor, the Hotel Governor Clinton, Inc., the relationship herein was, of course, fiduciary.

2. Between this Court and the persons purporting to act as attorneys for the several parties herein involved the relationship was fiduciary.

3. The Hotel Governor Clinton, Inc., the debtor corporation, was under the aegis of this Court after June 14, 1935, when the

77B proceedings in the bankruptcy court had been instituted in its behalf by Gladstone. Consequently at all the times under discussion here in December, 1936, and January and February, 1937, the debtor was in theory in custodia legis, and would have been in the possession of a trustee if this Court had then considered the appointment of a trustee necessary.

Consequently, even though Gladstone was not technically a member of this Court's Bar, if he purported to act for a corporation seeking sanctuary in the bankruptcy court, he was in a fiduciary relationship with the Court wherein the most perfect good faith was required of him, as would have been the case, for example, if he had been a layman appointed trustee of the hotel debtor.

■ 4. Between Gladstone and the attorneys for the bondholders the relationship was fiduciary de facto insofar as they were engaged together in the rehabilitation of the hotel, though of course there might have arisen occasions in which they would have had to deal at arm's length. We are not, however, here concerned with any such situations.

5. Gladstone was at arm's length with or antagonistic to Saxe and Spiegelberg and also, in theory, to Lewis.

B. Therefore, out of the tangle of legal relationships involved in this cause, there was only one, with which we are concerned, wherein the parties were in theory at arm's length, or antagonistic to each other, namely, that between Gladstone and his client, the Hotel Clinton, the debtor in 77B, on the one hand, and Terminal and its lawyers, inter alios Lewis, on the other.

The United States Attorney claims—as above indicated—that this antagonistic relationship between the Hotel and Terminal was sacrificed at the expense of the Hotel by the mutual action of Gladstone and Lewis taken to promote their own financial interests.

This claim constitutes the basis of the Government's charge of conspiracy herein, leading to a breach of Gladstone's fiduciary relationship with the hotel debtor.

Breaches of fiduciary relationships take many forms. But I have never before encountered what is claimed to be a mutual sacrifice of an antagonistic relationship resulting in such a breach. This is, perhaps, the least expectable form for the dereliction of a fiduciary to take.

Necessarily, such a sacrifice of an antagonistic relationship between fiduciary mandatories of two parties to a cause or negotiation, and its transmutation into disloyalty to their respective principals, involves subtleties of treachery which, from their essential nature, are not easily detectable or, indeed, capable of direct proof, but must be proved, if at all, by necessary or justifiable inferences from established facts.

The problem with which I am faced in this proceeding, therefore, is to determine whether on the facts shown in the record of the trial I am justified in finding that Gladstone and Lewis conspired together herein to settle the lease controversy without any honest effort on Gladstone's part to protect the interests of the debtor hotel.

VII. The negotiations of Saxe and Gladstone between December 18 and December 29, 1936, involved a discussion as to what sum Terminal should give for a cancellation of the lease in addition to the back rent amounting to a little less than $10,000 and the furniture and fixtures of the barber shop and beauty parlor.

It should perhaps be mentioned here parenthetically that a distinction is made throughout this cause between the categories of furniture and fixtures and furniture, fixtures and equipment. Equipment of the barber shop and beauty parlor included vibrators and other machines, towels, etc., which were of what might be called a peripatetic nature and so could be used elsewhere than in the Governor Clinton Hotel just as well as in their then locale. The distinction will be later mentioned in connection with the frustration of the attempted settlement by Lewis and Gladstone of the controversy between the hotel debtor and Terminal.

I find that the upshot of the negotiations between Saxe and Gladstone was that on the 29th of December, 1936, Gladstone had traded Saxe up so that Saxe offered Gladstone for a cancellation of the lease between Terminal and the hotel the sum of $17,500 *plus* the back rent for 1936 amounting to circa $10,000 *plus* the furniture and fixtures, and that Gladstone stated he would take up the offer with the bondholders committee and would recommend its acceptance. That is the reason, in my opinion, why the round sum of $27,500 recurs in the correspondence even as late as

the letter of January 19, 1937, from Lewis to Saxe.

This finding is confirmed indisputably by the upset amount of Lewis' contingent fee named in his retainer which consisted of the sum of $17,500 and the back rent for 1936.

VIII. It is difficult to see what adequate reason there was why Saxe should have retained Lewis when he could have completed the lease negotiations himself. Indeed the role which Saxe plays in this sordid legal drama is explicable, I think, only by his preoccupation with the reorganization of his firm which was proceeding under his direction during the crucial period here involved.

After the form of the Lewis retainer was agreed on January 6 it was known to Saxe, of course, that it was *possible* that no money would have to be paid on the settlement over to the hotel debtor, but he was frankly indifferent, provided there was an adequate and proper disclosure, how the total amount of cash which his client was ready to pay, namely, $27,362.79, was divided between Lewis and the hotel debtor.

Saxe states that he regarded the provision that the closing papers should be passed on by him and his clients as giving them residual control of the situation and as ensuring adequate disclosure.

But as he had made an offer of circa $27,500 to Gladstone in December, 1936, Saxe could hardly have thought a settlement without the payment of *any* cash to the hotel debtor was *probable*.

The terms of Lewis' retainer were settled on January 6, 1937. His talks with Gladstone began on January 7.

The letters from Lewis to Saxe and Terminal were not true statements of what was happening during the negotiations with Gladstone. He refers to conferences with the "attorneys for the Committee" which are shown not to have occurred, and on January 16, two days after his retainer was signed, he writes that he has "substantially arranged the surrender" although later in this same letter he says "we are still haggling as to detail but in the main we are practically agreed". But he does not say anywhere what the terms of the settlement were.

It seems to me, however, that the climax of Lewis' chicanery came in his letter of January 19, 1937, which advises Saxe that settlement within the terms of the re-

tainer **was** agreed on January 18, that the closing had been set for January 20, that the settlement ·papers are enclosed, and then says (Italics mine):

"Will you please be good ' enough to arrange to have your clients prepared to deliver the executed agreements tomorrow (January 20) *together with the sum of $27,500?*"

Again the impression conveyed is false; for under it I think it would be supposed that a payment of money was part of the closing, whereas what he wanted, as the letter of January 26—written the day after Judge Patterson's permissive order—shows, was a cheque *to himself* for the corrected amount of $27,362.79. This he wished to have available at the closing so that he might be paid before there were any difficulties made over the discovery of the fact that he was to get all the cash.

Of course Saxe, when he examined the closing papers, might have become aware that there was not any cash going to the Hotel, but *Terminal* did not know of this fact until Gans saw the copy of the permissive order and its supporting petition on February 2nd.

It is quite clear, I think, and I find, that Lewis did not deal candidly and fairly with his client, Terminal, in discharge of his fiduciary duty to it.

IX. Although he had been retained by Saxe on December 29, 1936, Lewis first met Saxe on January 6, 1937.

After what was apparently a somewhat cursory examination of the lease Lewis discussed with Saxe certain possible claims against the hotel debtor, namely, (1) failure by the corporation to conduct a high-class hotel; (2) the waiver by the corporation of the back rent due to the method it followed in billing Terminal therefor; and (3) failure to build a tunnel from the hotel to the Pennsylvania Station.

At this meeting also a rough draft of Lewis' retainer was made. But it was not put into final form and signed. Its terms, however, were so adequately understood by both Saxe and Lewis as to make Lewis feel that he could safely begin his proposed negotiations with Gladstone for the cancellation of the lease.

On January 7 Lewis first conferred with Gladstone and testifies that he presented the claims above mentioned, and threatened that Terminal would move out unless a settlement was reached. Glad-

stone testifies that he then asked Lewis for a statement of his position in writing. This was given to Gladstone by letter on January 8.

I think 'that, on the receipt of this letter, if Gladstone had taken Lewis' contentions seriously, and had been working in the interest of the hotel debtor and his colleagues representing the bondholders, he would have had a full conference on this new attitude of Terminal with counsel for the bondholders' committee. But he did not. Neither Jones nor Kadel of Kadel, Van Kirk & Trencher remembered seeing Lewis' letter to Gladstone of January 8, although a copy reached their office, and Andrews was not told what the claims were.

There is not any evidence that either Gladstone or Lewis made any investigation of the facts or law on the claims Lewis was putting forward for Terminal.

But the real question is not what Gladstone or Lewis now say that they thought of these claims, but whether the claims raised actually serious questions. If what was, possibly, the most plausible of them— the failure to maintain a high-class hotel— had aught in it, the burden was on Lewis and Gladstone to show in the *present* proceeding that the Hotel Governor Clinton was not maintained as a high-class hotel, by way of going forward with the evidence and showing some justification of Gladstone's change of attitude in not requiring a substantial cash payment for the cancellation of the lease. There has not been any such proof here.

I find, however, that the claims put forward for Terminal by Lewis did not raise serious questions, but,—put at their highest,—would only properly constitute a point of departure for new bargaining in an attempt to reduce the amount of the money offer which had been made by Saxe.

I find, therefore, that the claims on behalf of Terminal put forward by Lewis do not help to explain Gladstone's otherwise inexplicable surrender of the interests of his client, the hotel debtor.

X. It will be interesting now to consider the characteristics of the lease which was the subject .matter of the so-called negotiations between Gladstone and Lewis.

The lease which was dated April 5, 1929, provided that for a twenty year term from July 1, 1929, the Governor Clinton Hotel, Inc., leased space within its hotel to the Terminal Barber Shops, Inc., for the operation therein of a barber shop and a beauty parlor.

The rental for the space so leased was 15% of the gross receipts with a guaranteed minimum of $15,000. The 15% of the gross receipts was payable on or before the 10th day of each calendar month, and the balance, if any, of the minimum guaranty was payable for the year previous on January 15th of each year of the leased term.

The minimum total rent agreed for the twenty year term was, therefore, $300,000 and there was a chance that, if business was good, 15% of the gross receipts by Terminal would mean a still larger payment by Terminal to the hotel. From a financial standpoint the lease was not a bad one for the hotel, assuming Terminal's continued solvency.

From the point of view of the hotel's remedies for breach of covenant by the lessee, however, the lease was not satisfactory for the following two reasons:

1. Paragraph 25 of the lease gives the landlord the right to re-enter and dispossess the tenant for non-payment of rent, but it does not provide for any survival of damage. If the tenant is dispossessed for non-payment of rent the lease automatically terminates and the landlord can recover nothing for the remainder of the term. International Publications v. Matchabelli, 260 N.Y. 451, 184 N.E. 51; McAdam, Landlord & Tenant, p. 1383.

2. Paragraph 26 of the lease gives the hotel the right to re-enter and dispossess the tenant in case of the tenant's abandonment. It does not provide, however, that the landlord may re-enter and let the premises as agent for the tenant. While it has a provision that the tenant is responsible for damages in case of abandonment, the provision is silent as to when the damages accrue. In such case the right to damages accrues only at the end of the term fixed in the lease—1949. An action commenced before that time would be premature and would be dismissed. Cf. Lenco, Inc. v. Hirschfeld, 247 N.Y. 44, 159 N.E. 718; Hermitage Co. v. Levine, 248 N.Y. 333, 162 N.E. 97, 59 A.L.R. 1015.

In addition to these lacunae in the usual provisions for landlord's remedies, the repeated defaults and requests for modifications of the lease by Terminal, which are, common ground as above indicated, made the chance of giving Terminal a cancella-

tion of the lease in return for (a) back rent, (b) $17,500, and (c) a bill of sale of the furniture and fixtures—even if the equipment were omitted—something in the nature of a windfall to the hotel. This was a good settlement in respect of a lease poorly drawn from the landlord's standpoint.

I feel quite certain that Gladstone would not have let himself be wholly traded, so quickly as he was, out of such a good settlement for the hotel, if he had really tried to maintain the advantage which he knew he had reached in his December negotiations with Saxe, who, I find, had offered him a settlement on the lines above indicated.

If he had remained loyal to his client, Gladstone would have held fast to a portion at least of the proposed money payment, in spite of Lewis' arguments as to Terminal's claims against the hotel. For these claims, whilst they may have been a basis for new bargaining, and might have led to a compromise for a lower money payment than Saxe had offered, they should not have resulted in a volte face on Gladstone's part in respect of any money payment.

XI. The closing of the settlement which had been set by Gladstone and Lewis for January 20 was, as above indicated, postponed because Andrews thought there should be an order of the Court allowing it.

Such an order required a petition to support it, and on January 22, 1937, Gladstone verified a petition for an order permitting the settlement originally planned as above mentioned for a closing without an order on January 20.

The first thing which strikes me as I read this petition after a knowledge of the facts above set forth is that there is not any sum of money named in it except two somewhat misleading figures, namely, $29,-000, the approximate cost to Terminal of the installation of the barber and beauty shops, and $10,000 of allegedly disputed difference between the hotel and Terminal, which at this point emerged from the hotel's books for the first time.

The only removable fixtures and equipment cost originally for the beauty shop $7,473.98, and for the barber shop $8,279.59, a total of $15,753.57, but were not worth much at the times here in question, as Gladstone stated in his first talk with Stein.

The statement that "according to the books of the debtor there was an obligation by way of a disputed difference in the sum of approximately $10,000" was, I find, intentionally misleading.

The back rent of $9,862.79 had never been disputed by Terminal, and Gladstone knew this, as is shown, for example, by his letter of February 16, 1937, wherein in making claim for the back rent after the settlement had failed he says (italics mine): *"According to the records of the Hotel* there was due from you on January 15th, 1937 for the balance of the minimum rental for the year 1936 in accordance with your agreements the sum of $9,862.79."

But frankness with court or with client would not have served Gladstone's purpose. The course of deception which he followed, however, led towards and almost achieved his objective.

In view of what had preceded it, the petition of an honest man in Gladstone's place would have certainly disclosed all the negotiations had with Saxe with their upshot of a chance to get for the hotel debtor in money the back rent for 1936—circa $10,000—and $17,500 in addition, as well as the physical properties owned by Terminal involved in both the barber shop and the beauty parlor; would have told of the change from Saxe to Lewis as the lawyer for Terminal; of Lewis' new tactics; the probability of Terminal's being able to pay the agreed minimum rental; and, finally, the reasons for the change from a very advantageous settlement involving the money payment just noted to a settlement for the mere physical properties of Terminal in the hotel, coupled with an exchange of quittances.

I think, therefore, that Gladstone's petition for the permissive order was a calculated glossing over of the situation, was intentionally misleading to the Court, and constituted an obstruction of justice.

I do not put any value for the respondents on the consents to the order by Sullivan & Cromwell, Kadel, Van Kirk & Trencher, attorneys for the Series A bondholders' committee, and Jones, Clark & Higgson, attorneys for the Knott Management Corporation, which was then in charge of the Hotel, for I find that the circumstances involved had not been fully disclosed to them.

XII. When I turn from the petition to the report of the proceedings had at

the hearing in Court before Judge Patterson on January 25, 1937, which, with the petition just discussed, led to the signing of the order permitting the settlement in respect of the lease, and read those proceedings in the light of what is now shown to have happened, but which, I find, was not then known to anyone in the court room except Gladstone and Lewis, I am shocked. For I find the same suppression of the facts of the situation, and the same avoidance of the candor owed to the Court by all purporting to practice before it, as characterize the petition discussed above.

The proceedings before Judge Patterson of which a copy was marked by the Government as an exhibit are, insofar as they are relevant, as follows:

"Mr. Gladstone: We have this matter of the barber shop that I have to take up now in view of the fact that the plan calls for a disposition of the leases. This is one of the two really important leases on the property. There is a lease to this barber shop there that was on a percentage basis, and they have a lot of equipment there and, as business has been bad, we have been threatened with the removal of it. I started negotiations for it. All these gentlemen are familiar with that. As a result I worked out a settlement under which they are to turn over approximately $30,000 of equipment for a release in the situation. The board of directors will be in a position to make any new deal with anybody who comes in. There is no individuality about it. They are in competition with themselves in the neighborhood. It is a bad situation. There is no business being done. After very careful consideration we believe that this should be done, and I believe the committee even voted a broad resolution last week that this offer be accepted as I have worked it out.

"The Court: What is it? To get rid of the present barber shop?

"Mr. Gladstone: To get rid of the present barber shop.

"The Court: And release them from the lease?

"Mr. Gladstone: And release them from the lease. It was a 15% lease, and we take $30,000 of equipment that they have so that the hotel becomes the owner of a completely equipped barber shop and beauty parlor, which is practically the only separately owned part of the hotel.

"The Court: You let them off of the lease?

"Mr. Gladstone: We let them off of the lease. There is a serious question as to whether we haven't breached it with them.

"The Court: Is there a real question as to that?

"Mr. Kadel: There seems to be. Mr. Andrews is familiar with that.

"Mr. Andrews: We feel, as a business matter, that they are not and never have been a desirable tenant. We have always had trouble for the last five years, we have always had trouble in collections.

"The Court: Do you want authority to settle with them?

"Mr. Gladstone: Yes; we feel that we ought to have an order of the Court.

"The Court: What do they pay in rent now?

"Mr. Gladstone: 15 per cent now.

"The Court: No fixed rent. It is 15 per cent of gross?

"Mr. Gladstone: Oh, there is a minimum of fixed rent. They claim that they were—

"The Court: Are they now in arrears?

"Mr. Gladstone: Eight or nine thousand dollars on last year.

"The Court: They paid nothing last year?

"Mr. Gladstone: Yes; they paid about $5,000 last year. We had hoped to get $15,000 on it. If the equipment is moved out, if we have a bare place, we would have more capital expenditures to make.

"The Court: They have a right to move that out?

"Mr. Gladstone: It is all theirs.

"The Court: Any fixtures belonging to the estate?

"Mr. Gladstone: No; their own personal property.

"The Court: Their own personal property; and they have the right of removal?

"Mr. Gladstone: Yes.

"The Court: Are you sure of that?

"Mr. Gladstone: Positive.

"The Court: All right; I will sign an order then.

"Mr. Gladstone: I have it on consent of the attorneys, but your Honor asked me to bring it on at the hearing.

"The Court: Is there any objection by anyone to that barber shop business? (No response)

"Mr. Kadel: As a matter of fact, I think Mr. Andrews urges it.

"I think all counsel ought to get together and make a formal resolution congratulating your Honor on the results obtained in this reorganization and thanking you for your great patience.

"The Court: Not at all. Thank you."

I find that, so far as Gladstone was concerned, this hearing constituted an intentional and serious departure from his duty to show the highest good faith to the Court if he was using the privilege of practising before it.

XIII. On the petition above mentioned and on the oral representations made by Gladstone at the above described hearing, Judge Patterson signed the order of January 25, 1937.

On the next day, January 26, Lewis wrote to Saxe advising him that Judge Patterson had signed an order permitting the settlement and observed (italics mine):

"The matter has been fully consummated save for client's execution of the agreements and documents submitted and *the paying over of the moneys agreed, namely, the sum of $27,362.79 for which amount I trust check to my order will be available at the closing.*

"*The committees are anxious to dispose of the matter, and close at the earliest possible moment.*"

There was of course no need for any money at the closing, for it was to be without cash payment. But the letter of January 26th would, if shown to Terminal, make it appear that money was necessary thereat.

But, as the event proved, Gladstone and Lewis were not to succeed in getting any money into the hands of Lewis.

XIV. When Gans, the vice president of Terminal, discovered on February 2, 1937, the fact that the settlement arranged between Gladstone and Lewis did not involve any payment of money to the hotel, he conferred with Terminal's then recently engaged general counsel, George A. Spiegelberg, who, after talking to Andrews, representing the bondholders' committee, asked for and arranged a meeting on February 4 between himself and Saxe representing Terminal, on the one side, and Gladstone and Lewis on the other.

This meeting was held at Gladstone's office on February 4 as agreed. Quite naturally in view of the circumstances, as words were not minced, there was some heat involved in the discussion which occurred. But this heat—as is not always the case,—engendered some light which illumined the situation here under discussion to a great extent.

I have had Spiegelberg before me in three long cases—two in 1938, Brusselback et al. v. Cago Corporation et al., D.C., 24 F.Supp. 524, and Holmberg et al. v. Anchell et al., D.C., 24 F.Supp. 594, and one in 1939, Cray, McFawn & Co. v. Hegarty, Conroy & Co., Inc., et al., D.C., 27 F.Supp. 93— which occupied altogether a period of several months and from my observation of him I have formed a high opinion both of his probity as a man and of his competence as a lawyer.

Insofar, therefore, as Spiegelberg's evidence differs from the evidence of Gladstone and Lewis as to the conference of February 4, I have not any hesitation whatever in believing Spiegelberg, who, I think, admirably handled the disagreeable situation in which he found himself placed, and who, by later reporting on the whole matter to Judge Patterson, performed a real service to the Bench and Bar of this Court.

In spite of his personal views on it, which were not in doubt, Spiegelberg was willing to give Gladstone and Lewis a chance to clear up the situation provided they were willing to allow the hotel to have a fair share of what Terminal was willing to pay it.

Spiegelberg stated that the settlement permitted under the order of the Court could not be consummated, and suggested that Judge Patterson's permissive order should, within a few days, be vacated, and that the fact that Lewis had included the "equipment" of the barber shop and beauty parlor (see above) in his settlement papers, which his retainer of January 14 did not authorize him to do, was a basis for asking to have the permissive order vacated.

Spiegelberg also suggested that a fee of $7,500 would adequately remunerate Lewis and that the balance, circa $20,000, should go to the hotel.

But Lewis stood firm for his theory that he had earned the upset amount of his contingent retainer. Gladstone agreed with him. But, at last, when Gladstone saw that the settlement could not go through, he fell in with Spiegelberg's sug-

gestion that the permissive order of January 25 should be set aside.

The further details of the conference of February 4 may be left to the findings of fact. It will suffice here to observe that what Gladstone said at the conference indicates, in my opinion, a consciousness of guilt in having failed to make a full disclosure to the Court of the negotiations about the lease.

Gladstone had, after the conference of February 4, to engage in the process known in the East as "saving face". That, I think, is the most charitable explanation of his persistence in withholding from the Court in his petition of February 8 the circumstances under which the situation leading to the conference of February 4 had arisen. For obviously the petition of February 8 was still guardedly evasive, and the exhibits annexed to it—Gladstone's letter of February 4 to the attorneys for the bondholders' committee and the retainer of Lewis dated January 14—although they told more than had been known before, did not tell the whole story.

But it is unnecessary in this opinion to go into detail about it, for on February 9, on Gladstone's petition and the consent of the attorneys for the bondholders' committee, an order setting aside the permissive order of January 25 was granted, and the settlement without any payment to the hotel was prevented.

The order of February 9 is proof positive that the permissive order of January 25 had been granted without full disclosure to the Court of the facts then known in full only to Gladstone and Lewis.

Later, in May or early June, 1938, Terminal paid to the Governor Clinton Co., Inc.,—which on the reorganization had taken over the hotel and the lease with Terminal—the sum of $27,362.79, secured cancellation of the lease, and entered into a new arrangement in place thereof. Whilst this deferred settlement was perhaps not as advantageous for the hotel as a similar settlement in January, 1937, would have been, at least it meant that the main part of what Saxe had offered was ultimately used by Terminal in getting rid of the 1929 lease, and was the final and conclusive proof of Terminal's understanding of the situation, when Lewis came into the negotiations, as to the settlement between Saxe and Gladstone.

XV. My conclusions from the record and from the matters above discussed are as follows:

A. I find that an inference is not only justifiable but necessary that, in December, 1936, there was, as the United States Attorney charges, a conspiracy entered into between Gladstone and Lewis so to handle their negotiations regarding the Terminal lease as to divert from the hotel debtor's estate into the hands of Lewis as much as possible of the money payment offered to Gladstone by Saxe. The ultimate destination of this money which Lewis was to get is left by this record in the domain of pure surmise into which I may not judicially enter.

As there was a conspiracy, I do not think—in a disciplinary proceeding of this kind—that the precise date on which the conspiracy began or the precise amount involved is of decisive importance, provided the conspiracy is shown, as it is here, to have been operative at the time named in the information.

I find that it is necessarily inferable from the evidence, and I hold, that the conspiracy began in the latter part of December, 1936, and, as is characteristic of conspiracies, continued to develop in definiteness of detail until its frustration on February 4 at the interview between Saxe and Spiegelberg on the one hand and Gladstone and Lewis on the other when Gladstone saw that any further steps therein would be futile.

I find that in the petition verified by him on January 22, 1937, on which the order of January 25 permitting settlement was granted, and in his oral argument before Judge Patterson, Gladstone was guilty of considered lack of candor to and intentional deception of this Court, and that this is also true even of the petition verified by him on February 8 after his attempt to settle the controversy as to the lease without any money payment had been thwarted.

I, therefore, sustain the United States Attorney in his claim, as against the two respondents, of a conspiracy between them as charged, and as against Gladstone, of intentional lack of candor to and deception of this Court, as charged.

B. In order to approach the trial of this proceeding with an entirely fresh point of view, I have with sedulous care through-

out it avoided reading Judge Patterson's opinion which was mentioned at the trial, or any other part of the earlier proceedings in regard to its subject matter, than such parts thereof as were introduced into this record.

On this record, having seen both Gladstone and Lewis and heard them testify, I am convinced that in a cause in which, as here, they are interested parties, neither Gladstone nor Lewis can be regarded as reliable witnesses who can be counted on to give disinterested testimony and to tell the whole truth. Unless, therefore, their evidence involves an admission against interest, or is supported either by letters or documents, or by the evidence of other witnesses to whom I can give credence, I do not believe them.

The respective counsel for the respondents have handled the tactics of their defence with great astuteness and have made excellent arguments, but, in my opinion, they have been wholly unsuccessful in their attempt to drag the respondents clear of the net of circumstance which has been drawn around them by the evidence in the record before me.

C. I am brought, therefore, to the question of the disciplinary measures which I should take in this cause against each of the respondents.

I do not find any mitigating circumstances in respect of either respondent herein.

It is obvious from the foregoing, I find, that there should be an order disbarring the respondent Lewis from the Bar of this Court.

It is, in my opinion, also clear beyond any doubt that the respondent Gladstone has been guilty of conduct which would require him to be disbarred, if that remedy were open to me in this case. But it is not open because he is not a member of the Bar of this Court, although he has been enjoying the privileges of practice therein for years.

I find that Gladstone has been guilty of obstructing justice, by conspiring to attempt to divert into the hands of Lewis the sum of $27,362.79 which would have flowed into the estate of Gladstone's client, the hotel debtor, on the settlement of the lease which Gladstone could have made with Saxe.

This, of course, and his deceptions in the petitions above mentioned, constituted contempts of Court and are punishable as such. Title 28, U.S.Code Section 385, 28 U.S.C.A. § 385; Lord v. Veazie, 8 How. 251, 255, 12 L.Ed. 1067; Bowles v. United States, 4 Cir., 50 F.2d 848, 850, and cases there cited; United States v. Ford, D.C., 9 F.2d 990; In re Paris, D.C., 4 F.Supp. 878, 883. Cf. Clark v. United States, 289 U.S. 1, 12, 53 S.Ct. 465, 77 L.Ed. 993.

If the respondent Gladstone had not, as above indicated, petitioned to be admitted nunc pro tunc,—as of some unnamed date in 1916 or 1917,—to the Bar of this Court, the only disciplinary measure which it would have occurred to me to impose on him would have been a fine or imprisonment for contempt. But such punishment would be transitory, and leave open the possibility of his admission to the Bar of this Court hereafter.

But his petition has suggested to me a disciplinary measure which, I think, fits his situation admirably. Therefore, without going into the question of whether a Court has power to grant an order admitting an attorney nunc pro tunc and thus regularize his ad interim acts as an attorney—e. g., In re E. C. Fellows, 2 Scam. 369, 3 Ill. 369,—and without imposing any fine or imprisonment for contempt on Gladstone, I will deny his petition to be allowed to complete his alleged admission to the Bar of this Court, because this record shows that he is not a fit person to be a member thereof, and an order may accordingly be entered permanently debarring him from admission thereto.

The Government may have costs against each respondent.

XVI. In pursuance of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the United States Attorney must prepare in accordance with this opinion and submit to me through the Clerk's office findings of ultimate fact and the conclusions of law herein indicated. I do not want any details of evidence submitted as findings of ultimate facts.

All proposed findings of fact and conclusions of law submitted to me must be typed in triple spacing so that I may conveniently correct them if I wish to do so.

I suggest that with the findings of fact there be submitted a memorandum referring to the page in the record supporting each finding.

The United States Attorney must give five days notice of his proposed findings of

fact and conclusions of law to attorneys for the respondents.

Attorneys for the respondents, if they are so advised, may on the return day of such notice submit to me and serve on the United States Attorney criticisms of the findings of fact proposed by him.

As under Rule 52(a) only findings of fact and conclusions of law which I sign will be filed as part of the record herein, I suggest this course for the respondents' attorneys because counter findings will not be of avail to them. They must take their objections, if any, to my findings by way of appropriate assignments of error on any appeal which they may be advised to take.

After the findings of fact and conclusions of law are signed by me a final order or decree carrying costs to the Government may be submitted in accordance herewith.